(No. 65346)

*In re* ELIAS WILLIAM ROLLEY, JR., Attorney, Respondent.

*Opinion filed January 19, 1988.—Rehearing denied April 5, 1988.*

Daniel Drake, of Springfield, for the Administrator of the Attorney Registration and Disciplinary Commission.

James Walker, Ltd., of Bloomington, for respondent.

JUSTICE CUNNINGHAM delivered the opinion of the court:

In this disciplinary action, both respondent, Elias William Rolley, Jr., and the Administrator of the Attorney Registration and Disciplinary Commission (Commission) have taken exceptions to the recommendations of the

Hearing Board and the Review Board. The Hearing Board recommended a discipline of two years' suspension. Five members of the Review Board recommended a three-month suspension, one member of the Review Board recommended a six-month suspension, and two members of the Review Board recommended a two-year suspension.

Respondent was served with an eight-count complaint from the Administrator on November 13, 1985, and filed his answer to the complaint on January 15, 1986. Of the eight counts in the complaint, seven alleged misconduct by respondent in connection with his position as counsel for the trustees of the Hinthorn trust. The remaining count alleged wilful failure to file an Illinois income tax return for the year 1980.

Respondent was born in 1930 in Normal, Illinois. Except for going to college and law school at Northwestern University, respondent has lived in the Bloomington-Normal area all his life. Respondent was admitted to the practice of law in 1955, the year he received his law degree. Respondent married in 1965, and together he and his wife have four children.

Respondent worked in association with a law firm for nine years, and spent a part of this time working as a part-time assistant State's Attorney, part-time assistant Attorney General, part-time city attorney for Bloomington, and assistant public defender. Since the fall of 1965, respondent has been self-employed, and since 1971 has been a sole practitioner. Respondent's primary areas of practice have been real estate, probate, income tax, divorce and bankruptcy.

One of respondent's clients was Leslie J. Hinthorn, who died on December 22, 1977, leaving a will with two codicils prepared by respondent. When Hinthorn died, a trust existed that was established on February 4, 1977, for the benefit of Hinthorn's heirs. The trust was

amended on December 15, 1977, to authorize two named trustees to pay legal fees and other costs of the administration of Hinthorn's estate. Respondent prepared the trust and the amendment. The trust contained between $350,000 and $400,000 on December 22, 1977.

In January 1978, respondent was retained by the named trustees to represent the trust. Respondent then established a trust checking account, signed the signature card for the account and had possession of the trust account checkbook.

On October 31, 1978, Hinthorn's will was admitted to probate and respondent was appointed legal representative for the estate. The probate estate contained approximately $25,000 and real estate valued at $31,000.

Counts I, II, V and VI are not at issue. Each of these counts was dismissed or was found to have lacked sufficient evidence to prove misconduct. Counts III, IV, VII and VIII will each be considered in turn. Respondent has admitted wrongdoing in response to counts III, IV and VIII; the ultimate question for this court is the nature and extent of the discipline to be imposed. Also to be answered is the effect for purposes of attorney disciplinary proceedings of a successfully completed order of supervision for wilful failure to file an Illinois income tax return.

In August 1981, respondent drew a check for $72,000 payable to himself from the Hinthorn trust checking account. Respondent deposited the $72,000 into his attorney-client trust fund and later withdrew it, applying the money towards the purchase of a house to be used as respondent's personal residence. Respondent then executed a mortgage in favor of the Hinthorn trust.

On March 15, 1983, the trustees resigned and Peoples Bank became successor trustee for the Hinthorn trust. That same month, the bank took a mortgage against respondent's house and loaned respondent funds to reim-

burse the trust $72,000 plus $11^3/4\%$ interest. The Administrator charged respondent with intentional conversion of client funds in count III.

In respondent's answer to the complaint, he has admitted he did not have authority from the trustees to use trust funds to make himself a loan. Before the Hearing Board and the Review Board, respondent admitted that investing trust funds in a mortgage on his own home without the consent of the trustees was improper.

The Hearing Board, which called this count the most serious aspect of the entire complaint, found the withdrawing by respondent of the $72,000 from the Hinthorn trust for a personal purpose to be a conversion of client funds. Although it noted that the entire transaction was engaged in without any loss to the estate and showed a small profit, the Review Board concluded that respondent's conduct was overreaching and constituted a conflicting business transaction designed to bring the legal profession into disrepute.

In December 1981, respondent owned between 150 and 200 shares of stock in the Corn Belt Bank in Bloomington. During that month, respondent suggested to the trustees that the Hinthorn trust should invest in the purchase of Corn Belt Bank stock. Respondent learned from the Corn Belt Bank that the bank was offering $325 per share to buy its own stock. Shortly thereafter, respondent sold 50 shares of his own personal Corn Belt Bank stock to the Hinthorn trust at a price of $350 per share. At no time did respondent disclose his stock ownership to the trustees. In count IV, the Administrator charged respondent with investing trust funds in the purchase of stock from himself at an inflated price.

Respondent has admitted it was improper for him to purchase stock owned by himself for the trust without discussing that specific detail with the trustees. In 1983, the trust sold the stock for $259 per share. After March

1, 1984, respondent paid to the trust the difference between the amount the trust paid for the stock and the amount received when the trust sold the stock, plus 9% interest.

Both the Hearing Board and the Review Board concluded that the conduct complained of in this court constituted overreaching, self-dealing and conflicting business transactions. We agree with the findings of the Hearing Board and the conclusions of the Review Board.

There was a dispute between the Hearing Board and the Review Board as to what was being charged in count VII. The Hearing Board characterized count VII as a charge by the Administrator that respondent failed to timely file an accounting of the probate of the Hinthorn estate at the probate court. Characterizing the charge as such, the Hearing Board concluded, "There is no substantial evidence that acts of the respondent constituted misconduct although dilatory in nature."

The Administrator took exception to the findings of the Hearing Board, arguing that the Board misconstrued count VII. The Administrator argued, and the Review Board agreed, that count VII alleged that respondent made misrepresentations to the Commission. The Administrator sought to prove this by a letter from respondent to the Commission dated March 30, 1984. The letter was in response to the Administrator's initial inquiry regarding respondent's representation of the Hinthorn estate and trust. In this letter, respondent told the Administrator about the $72,000 "real estate mortgage" from the trust, but did not disclose that the mortgage was on respondent's personal residence. Respondent also told of the investment by the trust in 50 shares of stock in the Corn Belt Bank of Bloomington, but omitted the fact that the shares sold to the trust were respondent's personal shares of stock in the bank. In stating that the stock was subsequently sold by the trustees for "what it

had in it," respondent did not explain that the stock was sold at a lesser amount than the purchase price, and that the loss to the trust was made up by respondent. The Review Board found these statements to be self-serving and misleading.

Respondent also asserted that the fees paid to him from the Hinthorn estate were "set forth in the final report to the [probate] Court, which the court has approved." This statement was made by respondent in his letter to the Administrator on March 30, 1984. Respondent filed a final report with the probate court in May 1983, to which objections by the beneficiaries were filed. An answer filed by respondent in July of 1983 was soon followed by additional objections. Respondent filed a "revised final report" and his receipt for the fees set forth in the revised final report on February 1, 1984. On February 24, 1984, respondent filed a receipt from the beneficiaries, both of whom were represented by counsel other than respondent, which stated that they had received their full distributive share under the estate, acknowledged receipt of a copy of the final report, waived notice of hearing on the final report, and consented "to the approval of said report and the disbursements and fees paid by the Executor as shown by said report, and *** to the discharge of said Executor."

Respondent states he left drafts of an order approving the final account and an order declaring the estate settled and discharging the personal representative with the probate court on the same day. The order was not officially approved until April 22, 1985. According to respondent, he was unaware that the probate court had not acted on the order approving the final account when respondent wrote the Administrator on March 30, 1984. When respondent found out that this had not been done, he brought the matter to the attention of the probate court. Since all parties had waived hearing on the final

report and had consented to its approval, the probate court entered the orders without further notice and hearing. The order by the probate court of April 22, 1985, approves the revised final order filed on February 1, 1984.

The Administrator alleges that respondent knew of the objections pending from the beneficiaries when respondent wrote the letter to the Commission on March 30, 1984, stating that the final report had been approved by the probate court. From our review of the facts, it would not be unreasonable for respondent to have had a good-faith basis for believing that the revised final order had been approved. The record shows that the beneficiaries agreed to the revised final report filed by respondent on February 1, 1984, and had waived further notice or hearing. Given this, we are unable to conclude, as the Administrator has, that respondent made affirmative misrepresentations to the Commission concerning approval of the final report. We do conclude, however, that respondent's statements concerning the mortgage and the stocks were self-serving and misleading.

Respondent earned income in Illinois in calendar year 1980, and did not file a tax return by April 15, 1981. Respondent filed his return for 1979 and 1980, paying all taxes, penalty and interest in January 1982. In August 1982 a criminal complaint was filed against respondent, charging him with wilful failure to file an Illinois income tax return in violation of section 1301 of the Illinois Income Tax Act (Ill. Rev. Stat. 1981, ch. 120, par. 13—1301). On January 18, 1983, respondent pleaded guilty to the charge, received a $500 fine, and was placed under court supervision for one year. In the best interest of justice, the court found that an order of supervision was more appropriate than any sentence otherwise permitted under the Unified Code of Corrections. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—6—1(c)(3).) Respondent success-

fully completed the court supervision, and in April 1986, the charges against him were dismissed.

Count VIII charged respondent with wilful failure to file an Illinois income tax return. The documents from the court file of the circuit clerk of Sangamon County were the only evidence produced by the Administrator. The Administrator asserted that respondent's guilty plea was clear and convincing evidence that respondent wilfully failed to file his Illinois income tax returns.

The Hearing Board found "the filing of a criminal complaint for tax evasion, including appearance in a court, within itself, brings the legal profession into disrepute." Respondent points out that if the mere filing of a criminal complaint were grounds enough for discipline, then violence is done to the presumption of innocence. Of course, those facts are not before us; respondent pleaded guilty to the charge of wilful failure to file Illinois income tax returns. More than the mere filing of a criminal complaint has occurred.

The Review Board noted the existence of count VIII but gave no express finding as to whether or not the Administrator had discharged his burden of proving respondent guilty of wrongdoing.

Respondent does not dispute that he wilfully failed to file his income taxes and pleaded guilty to a complaint. Respondent contends that the termination of a criminal charge by an order of discharge and dismissal at the successful conclusion of a period of supervision is neither a judgment of conviction nor the basis for the imposition of discipline. To support this, respondent directs attention to the following:

> "Supervision. 'Supervision' means a disposition of conditional and revocable release without probationary supervision, but under such conditions and reporting requirements as are imposed by the court, at the successful conclusion of which disposition the defendant is dis-

charged and a judgment dismissing the charges is entered." (Ill. Rev. Stat. 1985, ch. 38, par. 1005—1—21.)

"Incidents and Conditions of Supervision. (a) When a defendant is placed on supervision, the court shall enter an order for supervision specifying the period of such supervision, and shall defer further proceedings in the case until the conclusion of the period.

\* \* \*

(d) The court shall defer entering any judgment on the charges until the conclusion of the supervision.

(e) At the conclusion of the period of supervision, if the court determines that the defendant has successfully complied with all of the conditions of supervision, the court shall discharge the defendant and enter a judgment dismissing the charges.

(f) Discharge and dismissal upon a successful conclusion of a disposition of supervision shall be deemed without adjudication of guilt and shall not be termed a conviction for purposes of disqualification or disabilities imposed by law upon conviction of a crime. \*\*\*" Ill. Rev. Stat. 1985, ch. 38, pars. 1005—6—3.1(a), (d), (e), (f).

The purpose of a criminal prosecution is not the purpose of a disciplinary proceeding. Whether an attorney is a proper person to be permitted to practice law is the question which must be asked and answered through the procedures of the Commission, and ultimately by this court.

Convictions of crimes of moral turpitude establish a *prima facie* case constituting grounds for discipline. In *In re O'Hallaren* (1976), 64 Ill. 2d 426, this court stated that conviction of wilful failure to file an Illinois income tax return does not necessarily establish moral turpitude, but does establish "misconduct constituting grounds for discipline in the absence of mitigating circumstances of an extraordinary nature." (64 Ill. 2d at 432.) We found in *In re Hopper* (1981), 85 Ill. 2d 318, even absent intent to discredit the legal profession, that failure to file income tax returns brings the legal profes-

sion into disrepute. *In re Hopper*, 85 Ill. 2d at 322 (citing *In re Andros* (1976), 64 Ill. 2d 419, 424; *In re O'Hallaren* (1976), 64 Ill. 2d 426, 434; and *In re Washington* (1975), 62 Ill. 2d 23).

It is not the conviction of a crime which justifies discipline, but the commission of the act. The attorney is being disciplined not because of his conviction but because of the conduct. (*In re Crane* (1961), 23 Ill. 2d 398, 400.) This court has held that "[i]t is not necessary that his misconduct should subject him to indictment, or that, if the misconduct charged amounted to a crime, he should be prosecuted and convicted before disbarment." (*People ex rel. Chicago Bar Association v. Meyerovitz* (1917), 278 Ill. 356, 365.) A subsequent pardon for a crime does not necessarily preclude discipline by the court. (*People ex rel. Johnson v. George* (1900), 186 Ill. 122, 128.) Even the formal acquittal of a criminal charge does not automatically bar a disciplinary proceeding based on the attorney's conduct upon which the criminal charge was founded. (*In re Browning* (1961), 23 Ill. 2d 483, 491.) If an acquittal does not bar disciplinary action, it follows that successful completion of an order of supervision will not bar disciplinary action.

The evidence submitted by the Administrator, consisting of the charge and the guilty plea, the disposition of supervision, and the imposition of a fine, affirmatively proves that respondent was late in filing his taxes. Respondent then had the burden to adduce evidence of mitigating circumstances surrounding his plea of guilty to the charge of failure to file an income tax return.

We hold that a guilty plea to a charge of wilful failure to file an Illinois income tax return, to which a disposition of supervision is given and subsequently successfully completed, may be the basis for the imposition of discipline by this court.

With the exception of the failure of respondent to file his State income tax return, all charges grew out of respondent's involvement with the Hinthorn estate. Except for the dealings with the mortgage and stock, respondent appeared to have had a good-faith belief that he was doing a service to the estate. Respondent made full restitution to the trust before he filed his answer to the Administrator's complaint in January 1986.

Although there was no ultimate loss to the estate or the trust, it is well settled that restitution will not serve as a defense to a disciplinary action. (*In re Feldman* (1982), 89 Ill. 2d 7, 13.) Restitution may, however, be taken into consideration as a factor in mitigation. *In re Lenz* (1985), 108 Ill. 2d 445, 453.

Respondent has practiced law in Illinois since 1955. During that time, the only complaint brought to the attention of the Commission is the one presented here. Bernard T. Grimes, an attorney from respondent's community who has been practicing since 1938, testified to having known respondent since 1955. Grimes states that respondent had a good reputation in the legal community.

Respondent's mother suffered a stroke in November of 1980, with resulting paralysis of her right arm and leg. The condition of respondent's mother was such that she had to be confined to a nursing home and was hospitalized several times for serious conditions, including bladder problems and an operation for breast cancer. Respondent's mother was no longer able to live independently; she was not able to walk or to manage her business or property concerns until her death in 1983. Respondent would visit his mother almost daily. The problems connected with managing his mother's affairs fell largely on respondent.

Respondent's brother-in-law's marriage ended in divorce in late 1981 or early 1982. Before the divorce, the

wife of respondent's brother-in-law and her daughter would unexpectedly come to respondent's house, sometimes staying as long as a month. The woman took her daughter on several unannounced trips out of State, causing great concern to respondent and his family. This woman was eventually hospitalized and diagnosed as paranoid schizophrenic.

Respondent testified that the stress and burden placed on him by the combination of his mother's disability and the marital problems of his in-law's family put tremendous pressure on him. This in turn led to a depression which kept him from using his best judgment during the times in question.

However unfortunate the circumstances which shaped respondent's life during 1980-81, respondent cannot be absolved from his wrongdoing. Respondent's act of loaning himself $72,000 from a trust account for which he served as counsel for the trustees falls below the high standard to which attorneys must be held. The self-dealing apparent in respondent's selling of his own stock to the trust fund which he represented cannot be allowed to go unreprimanded.

It is clear that the purpose of attorney disciplinary proceedings is to safeguard the public and maintain the integrity of the legal profession. (*In re Levin* (1979), 77 Ill. 2d 205, 211.) While we recognize the need to attempt to be uniform in the sanctions imposed in these cases (*In re Clayter* (1980), 78 Ill. 2d 276, 283), we are also cognizant of the fact that each case presents a unique factual situation and must therefore be carefully evaluated based on its own merits. *In re Hopper* (1981), 85 Ill. 2d 318, 324.

Taking into consideration the seriousness of the misconduct, the admission of wrongdoing on the part of respondent, and the factors offered in mitigation, this

court finds the appropriate sanction to be a suspension from the practice of law for a period of 18 months.

*Respondent suspended.*