(No. 65040.—

*In re* MICHAEL MASAHARU USHIJIMA, Attorney, Respondent.

*Opinion filed November 23, 1987.—Rehearing denied February 2, 1988.*

52

WARD, J., took no part.

Scott Renfroe, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

Wayne B. Giampietro, of Chicago (Poltrock & Giampietro, of counsel), for respondent.

JUSTICE SIMON delivered the opinion of the court:

The Administrator of the Attorney Registration and Disciplinary Commission filed a two-count complaint charging the respondent, Michael Masaharu Ushijima, with misappropriation of client funds, and with giving false testimony in a garnishment proceeding in an attempt to conceal that misappropriation. The Hearing Board found that the respondent had inadvertently failed to preserve the identity of client funds but had not converted any funds or knowingly given false testimony. Concluding that the respondent was nevertheless guilty of unprofessional conduct, the Hearing Board recommended that respondent be censured. Based on its own findings that the respondent had converted client funds and had tried to conceal that conversion by giving false testimony, the Review Board reversed the findings of the

Hearing Board and recommended that the respondent be suspended for one year. The Administrator argues for more severe sanctions, while the respondent maintains that neither suspension nor censure is justified in this case.

Because the Review Board's factual findings differ substantially from the Hearing Board's, it is important to summarize the record in order to explain those differences. In January 1977, complainants, Monique Zermatten and David and Marcella Meglay met with the respondent to discuss legal problems arising from their investments in a film entitled "The Last Affair" and in Chelex, Ltd., a corporation formed to acquire and operate what was formerly the Playboy Theatre on North Dearborn Street in Chicago. After an unsuccessful attempt to manage the theatre themselves, complainants decided to sell Chelex' leasehold interest in the theatre. Together with an attorney for the other Chelex investors, the respondent prepared the necessary documents and represented complainants in the negotiation and closing of the sublease sale.

Pursuant to the sale contract, the leasehold assignee tendered to the respondent earnest money totalling $11,171.85. Respondent deposited this money into an escrow account from which certain outstanding debts of Chelex, such as State and Federal taxes, were to be disbursed. Complainants maintain that they did not authorize the respondent to withdraw $2,000 in fees from this account; the respondent testified that complainants had authorized this payment. The Hearing Board concluded that the authority should have been in writing, but the Review Board found that the respondent never had the authority to withdraw the $2,000.

By the end of 1977, several other checks were issued from this account: $3,565.11 payable to the Internal Revenue Service in partial payment of Chelex' tax obliga-

tions; $259.32 payable to Illinois Department of Revenue in payment of Chelex' obligations to that Department; an additional $2,000 payable to the respondent's office account; and at least two additional checks payable to the respondent in the total amount of $1,350. On January 19, 1978, in a garnishment proceeding brought against Chelex, respondent testified that all the escrow funds had been disbursed and that he had three cancelled checks evidencing the payment of $5,347.42 to the I.R.S. and the State Department of Revenue. On March 15, 1978, respondent filed an affidavit informing the court that his testimony was mistaken: he had no evidence that the revenue authorities had been paid. Here again, the findings of the Hearing Board differ from those of the Review Board; the Hearing Board found that the respondent had not knowingly made a false statement, and the Review Board found that false statements were made in an attempt to conceal the conversion of clients' funds.

In 1979 the I.R.S. contacted the complainants on several occasions concerning the tax obligations of Chelex, which respondent told complainants had been paid. Beginning late in 1979 and continuing through 1981, complainants requested from the respondent an accounting of the disbursements from the escrow fund. On November 20, 1981, in response to an inquiry from the Administrator, the respondent tendered a document that showed that the balance of the escrow fund ($5,347.42) had been transferred to the respondent, purportedly for fees and costs. On November 10, 1983, nearly four months after the Administrator's complaint in this matter had been filed, the respondent issued three checks to the revenue authorities in payment of Chelex' remaining obligations. Respondent testified that he delayed making these payments because he was angry at his clients, who had refused to pay his fees. The Hearing Board found

that the balance in the escrow fund had been transferred inadvertently to respondent's general office account and, while this handling of the escrow was sloppy and unprofessional, it did not constitute conversion. In contrast, the Review Board found that respondent's conduct was a conversion of client funds, and that the failure to provide clients with an accounting of escrow disbursements further supported its recommended sanction.

Our review of this matter is guided by the principles set forth in *In re Hopper* (1981), 85 Ill. 2d 318, 323:

"[T]he hearing panel's recommendation is advisory and not binding; yet, it is entitled to virtually the same weight as that of a trier of fact in a judicial proceeding. (*In re Wigoda* (1979), 77 Ill. 2d 154, 158.) Where the question is the credibility of witnesses, resolution of conflicting testimony, or other such fact-finding judgments, the hearing panel should be afforded a good deal of deference. There is great advantage, when finding facts, to hearing live witnesses instead of reading a cold record. Thus, the hearing panel's finding is entitled to great weight when the panel is acting as a trier of fact. But when it comes to imposing discipline, the final responsibility rests with this court. [Citation.] The recommendations of the hearing panel and Review Board will be considered only as recommendations, as suggestions. This court is not required to adopt them."

Having reviewed the record, we believe that the Review Board did not give due deference to the trier of fact in making several of its factual findings. In particular, there is conflicting evidence regarding the respondent's authorization to withdraw the first $2,000 and whether the respondent knowingly made false statements in the garnishment proceeding. The Review Board simply reversed the Hearing Board's findings that the respondent was authorized to withdraw $2,000 and had not knowingly made false statements in an attempt to conceal conversion. The Review Board did not, nor do

we, find that those factual conclusions of the Hearing Board are against the manifest weight of the evidence.

On the other hand, the Review Board's conclusion that the respondent's conduct amounted to a conversion of client funds is a conclusion of law that is well supported both by undisputed facts and by our previous cases. This court has repeatedly upheld findings of conversion based on situations in which the balance in a client account fell on several occasions below the amount entrusted to the lawyer. (*In re Young* (1986), 111 Ill. 2d 98, 102-03; *In re Clayter* (1980), 78 Ill. 2d 276, 282.) In this case, whether or not one accepts the respondent's claim that he was authorized to withdraw $4,105 payable to himself from the escrow account, there is no doubt that by February 1, 1978, when the balance in the escrow account fell to $2,368.38 and respondent was still entrusted with at least $3,242.42, respondent had converted client funds. Thus, the Hearing Board's conclusion that there had been no conversion and that the balance of the escrow account had been transferred inadvertently to the respondent's general office account in 1979 is against the manifest weight of the evidence. The Review Board's determination that respondent converted client funds must be upheld.

Respondent argues that imposition of censure in various other disciplinary cases suggest that censure is appropriate here too. Though we continue to believe that "[p]redictability and fairness require that there be a degree of consistency in the sanctions imposed for similar types of conduct" (*In re Hopper* (1981), 85 Ill. 2d 318, 324), to be realistic we must emphasize that each disciplinary case is unique, and sanctions must be decided on the basis of the unique facts of each case. (*In re Trezise* (1987), 118 Ill. 2d 346, 357 ("Although uniformity in discipline is desirable, every case must be considered on its own merits"); see also *In re Vavrik* (1987), 117 Ill. 2d

408, 416.) Thus, we note, as we have explained in the past, that many of the cases involving "technical commingling and conversion" warranted sanctions less stringent than suspension because of circumstances peculiar to those cases. (*In re Solomon* (1987), 118 Ill. 2d 286, 296.) For example, *In re Winn* (1984), 103 Ill. 2d 334, and *In re Kink* (1982), 92 Ill. 2d 293, cited by the respondent for the proposition that severe discipline is not warranted where no dishonest motives are shown, did not involve conversion of client funds. As this court reaffirmed in *In re Clayter* (1980), 78 Ill. 2d 276, 283, evidence of dishonest motive is an appropriate factor to consider in determining the severity of sanctions, but lack of dishonest motive does not preclude the imposition of discipline. In fact, "[w]e have repeatedly stressed the importance of an attorney trust account and the gravity of converting client funds, even if done without an invidious motive." *In re Lewis* (1987), 118 Ill. 2d 357, 362.

Respondent's reliance on *In re Freel* (1982), 89 Ill. 2d 263, and *In re Kramer* (1982), 92 Ill. 2d 305, is similarly misplaced. In *Freel*, there was no conversion of client funds. (*Freel*, 89 Ill. 2d at 270.) And in *Kramer*, it was not disputed that some portion of the escrow account was due respondent Kramer; neither the Hearing Board nor the Review Board found that Kramer converted client funds. (*Kramer*, 92 Ill. 2d at 310.) Likewise, the respondent's argument is not supported by *In re Enstrom*, for in that case the explanation for the attorney's account balance falling below the amount he held for clients was that he had placed the funds in an account that was subject to a tax levy. (*In re Enstrom* (1984), 104 Ill. 2d 410, 415; see also *In re Solomon* (1987), 118 Ill. 2d 286, 295-96 (distinguishing *In re Enstrom* and *In re Clayter* from more serious conversion cases).) To the extent fairness requires comparison between *In re McLennon* (1982), 93 Ill. 2d 215, and *In re Clayter* (1980), 78

Ill. 2d 276—in which only censures were imposed—and *In re Green* (1984), 104 Ill. 2d 65, and *In re Brody* (1976), 65 Ill. 2d 152—in which suspensions were imposed—we believe the facts in this case more closely approximate the latter cases. Although the respondent cooperated with the Attorney Registration and Disciplinary Commission to a greater degree than the respondent in *Brody*, that case involved very similar facts:

> "He not only wrongfully commingled the money placed in escrow with his personal funds but he used the funds for personal purposes and ended by closing the account in 1972. His client testified that he communicated with the respondent about two dozen times in vain efforts to have the respondent make payment from the escrow fund." (*Brody*, 65 Ill. 2d at 156.)

In *Brody* we criticized the respondent's indifference to both his client's interests and the disciplinary procedures, and suspended him for one year.

This case involves a more substantial conversion of client funds compounded by the respondent's persistent failure to account for funds held in escrow, despite repeated requests from his clients. Yet, throughout these disciplinary proceedings, the respondent has maintained that complainants were not harmed and therefore he should not be disciplined. Respondent's arguments manifest an overly narrow conception of harm to his clients. The facts of this case amply demonstrate how an attorney may harm his clients by delaying payments from an escrow fund. Here, by failing to pay revenue authorities, the respondent exposed his clients to the risk that the escrow fund would be seized in garnishment proceedings before the tax obligations, for which his clients would have been personally liable, were paid. Thus, the fact that the respondent finally paid the revenue authorities or that "clients were fortunate enough to have their money converted by a lawyer who did not harbor devi-

ous purposes *or* teeter on the brink of bankruptcy" (*In re Lewis* (1987), 118 Ill. 2d 357, 364) in no way excuses the respondent's unprofessional conduct. Nor do we find any excuse for the respondent's sloppy accounting and misstatements in the garnishment proceeding.

We recognize that the respondent has been cooperative in these proceedings, has presented evidence from practicing attorneys of his good reputation, and has practiced law in Illinois since November 1966 without other complaints to the ARDC, but we also believe that there are aggravating factors in this case. Throughout, the respondent has portrayed himself as the victim of deadbeat clients. His attitude evinces a complete misunderstanding of the purpose of attorney disciplinary proceedings; it is not to settle fee disputes. Rather, our function is "to maintain the integrity of the legal profession, to protect the administration of justice from reproach, and to safeguard the public." (*In re LaPinska* (1978), 72 Ill. 2d 461, 473.) We find unacceptable the indifference to clients' interests that the respondent admitted to when he stated that he had refused to make restitution because he was angry at his clients. We believe that holding client escrow funds as ransom in a fee dispute brings substantial disrepute to the profession. Moreover, we believe the public should be protected from anger that would cause an attorney to disregard his professional responsibility. Therefore, we believe that a suspension of 18 months provides an adequate sanction that is proportionate to the respondent's misconduct.

*Respondent suspended.*

JUSTICE WARD took no part in the consideration or decision of this case.