(No. 66767.—

*In re* KENNETH HENRY HOLZ, Attorney, Respondent.

*Opinion filed December 6, 1988.—Rehearing denied January 30, 1989.*

548

Daniel Drake, of Springfield, for the Administrator of the Attorney Registration and Disciplinary Commission.

William J. Harte, Ltd., of Chicago (William J. Harte and David J. Walker, of counsel), for respondent.

CHIEF JUSTICE MORAN delivered the opinion of the court:

The Administrator of the Attorney Registration and Disciplinary Commission (ARDC) filed a six-count complaint alleging, *inter alia*, that respondent, Kenneth Henry Holz, commingled and converted the funds of two of his clients, Carolyn Monacelli and R.W. Riley; charged excessive fees for his representation of Monacelli; and filed false bankruptcy documents. A majority of the members of the Hearing Board found that respondent commingled Riley's funds with his own and charged an excessive fee to Monacelli. The majority dismissed the remaining charges and recommended that its findings remain a part of the Administrator's records to be considered as an aggravating factor in any future disciplinary proceedings. One dissenting member of the Hearing Board found that respondent commingled and converted the funds of Monacelli and Riley, charged an excessive fee to Monacelli, and filed false bankruptcy documents. The dissent recommended that respondent be disbarred. The Review Board adopted the findings of the dissent and recommended that respondent be suspended from the practice of law for a period of three years. Respondent filed exceptions to the report and recommendation of the Review Board. 107 Ill. 2d R. 753(e)(5).

The issues presented for review are: (1) whether the Administrator proved each of the allegations by clear and convincing evidence; and (2) if so, what measure of discipline, if any, should be imposed upon respondent.

The initial charges of misconduct stem from respondent's representation of Carolyn Monacelli. Respondent testified that he and his wife were close friends with the Monacelli family. On January 24, 1973, Mr. Monacelli committed suicide. Respondent testified that Monacelli immediately asked him to handle the sale of the residence, collection of life insurance benefits and settlement of the estate.

In her deposition, Monacelli testified that she told respondent to "handle whatever has to be handled." She further stated that she had not signed any documents and had not discussed attorney fees. On January 29, 1973, Monacelli moved to Pennsylvania.

On March 9, 1973, respondent opened Mr. Monacelli's estate in probate court. Respondent testified that he had only minimal probate experience and he had never prepared a Federal estate tax return. He stated that his practice is concentrated primarily in the areas of workers' compensation and personal injury.

On June 22, 1973, respondent completed the sale of the residence. He received a draft payable to Monacelli in the amount of $51,120.14, representing the net proceeds of the sale. He endorsed the draft and deposited it in an account at the First Federal Savings and Loan Association of Aurora (the Aurora account). Respondent testified that this was not an attorney-client trust account and he had never maintained a trust account.

In a letter dated July 22, 1973, Monacelli directed respondent to retain the amount of money necessary to cover all of the fees and taxes, and then to send her the balance. On July 31, 1973, respondent withdrew $9,232.10 from the Aurora account to discharge a loan

obligation of Monacelli. Respondent stated that he withdrew an additional $2,500 as his fee for handling the sale of the residence. Respondent did not remit the balance to Monacelli. He explained that he was unsure how much money would be needed to pay the taxes.

On October 11, 1974, respondent closed the Aurora account. The balance totalled $42,059.57, including the interest earned. Respondent testified that he *believes* he transferred the funds to the Harris Trust and Savings Bank (the Harris account). He stated that the Harris account was not a trust account. The records of the Harris account were not available and were therefore not introduced into evidence.

Respondent testified that in April 1975, he retained another attorney, Stephen Lewis, to close the probate estate. He further testified that he learned from Lewis that it was not even necessary to open the estate in 1973. Respondent also stated that Monacelli agreed to pay Lewis $2,500 for his services.

On July 9, 1975, respondent opened an account at the American National Bank and Trust Company (the American account). He testified that the American account was not a trust account.

On August 12, 1975, respondent sent Monacelli a check in the amount of $26,569.92, drawn against the American account. According to respondent, this sum represented the net amount due from the sale of the residence. Respondent testified that he deducted an *additional* $10,000 fee for himself, as well as the $2,500 fee for Lewis. The check was backdated to May 12, 1975. Respondent testified that when he sent Monacelli the check on August 12, 1975, he advised her that he would compute the interest earned on the sale proceeds and would forward that amount.

On August 18, 1975, respondent deposited $14,790 in currency and a $4,553.11 check in the American account.

Respondent stated that this deposit was used in part to fund the $26,569.92 check to Monacelli.

Respondent testified that he could not trace Monacelli's funds from the time they were transferred to the Harris account until the time she was paid. He stated that although he made every effort to safeguard Monacelli's money, he does not know specifically what he did.

In 1986, thirteen years after the sale of the residence, respondent sent Monacelli $5,000 as the interest payment on the sale of the residence. He testified that he "just forgot" to send the interest payment sooner. He stated that he will continue to send interest payments as funds become available.

Jack Kuhlman, an attorney qualified as an expert witness, testified that the $12,500 fee that respondent charged Monacelli was "clearly excessive." Kuhlman stated that the real estate and probate matters were routine, and would take a lawyer of reasonable experience between 20 and 30 hours to complete. He further stated that the customary fee in 1973 for the services rendered was between $1,500 and $2,500.

Respondent conceded, in light of Kuhlman's testimony, that the fee was excessive. He explained that he had decided to charge a contingency fee of 10% of the estate, and not a fixed fee, because he was accustomed to working on a contingency fee basis.

Further charges of misconduct stem from respondent's representation of R.W. Riley. Riley testified that he retained respondent in January 1975 to represent him in a personal injury action.

Respondent testified that Riley authorized a settlement of $6,000, but the insurance adjuster, Richard Hope, would only offer $5,800. In September 1975, respondent decided to accept this offer and reduce his fee by $200. On September 12, 1975, respondent received a check in the amount of $5,800 and he deposited it in the

American account. He testified that he then conveyed the news of the settlement to Riley.

According to respondent, Riley informed him that he expected to receive $6,000 *after* the deduction of attorney fees and costs. Respondent stated that he contacted Hope to reopen settlement negotiations. He also stated that he contacted Riley on numerous occasions to negotiate an amicable settlement as between himself and Riley, but Riley would not cooperate.

Hope testified that he had no recollection of respondent's attempting to reopen settlement negotiations. He further stated that he did not even have authority to do so.

Riley testified that respondent did not notify him to remedy the situation. However, the Hearing Board found that Riley's testimony lacked credibility.

The American account was overdrawn on November 12, 1975. On numerous occasions the balance in the American account dropped below $5,800.

In March 1976, respondent deposited Riley's funds in a new account at First Federal Savings of Chicago (the First Federal account). Respondent, his mother and his father were signatories on the First Federal account. He testified that although this was not a trust account, he believed Riley's funds would be adequately protected because his name was listed beneath the names of his mother and father.

In 1976, respondent filed a verified petition in bankruptcy. Respondent did not list the settlement money owing to Riley as a debt. He testified that he did not consider it a debt. Instead, he believed he was a trustee holding funds for Riley. He also did not list the First Federal account as an asset. He testified that the funds in the First Federal account belonged to Riley. He also did not disclose a transfer of $5,000 from the First Federal account to an account at Bank Leumi. He explained

that he did not disclose the transfer of funds because he intended to use that money to pay his attorney fees in the bankruptcy proceedings.

On November 12, 1982, respondent sent Riley a check in the amount of $7,139.69, drawn against the First Federal account. This sum represented the amount of Riley's settlement, less respondent's fees and costs, plus the interest earned since 1975.

The Administrator has the burden to prove each allegation by clear and convincing evidence. (*In re Betts* (1985), 109 Ill. 2d 154, 175.) Respondent concedes that he commingled the funds of Monacelli and Riley with his own funds in violation of Disciplinary Rule (DR) 9—102(A) of the Illinois Code of Professional Responsibility (1970)(Code). He also concedes that he charged an excessive fee in violation of DR 2—106(A) of the Code. However, respondent contends that the Administrator failed to prove, by clear and convincing evidence, that he converted the funds of Monacelli and Riley and that he filed false bankruptcy documents. We disagree.

The evidence in the record supports the finding that respondent converted Monacelli's funds. In June 1973, respondent placed the proceeds of the real estate sale in the Aurora account. One month later Monacelli directed respondent to retain the amount of money necessary to cover all of the fees and taxes, and then to send her the balance. Respondent did not forward the balance. Finally, on August 12, 1975, more than two years after Monacelli requested her money, respondent remitted a check in the amount of $26,569.92. Throughout this period of time Monacelli questioned respondent as to the status of her funds. Respondent explained that he did not send the funds sooner because he was unsure how much money would be needed to pay the taxes. We find respondent's explanation to be inadequate. As a profes-

sional, respondent should have taken prompt action to determine the amount of the taxes.

Respondent's failure to send Monacelli her funds for more than two years, coupled with his highly questionable conduct during the two-year period, leads this court to believe that respondent converted the funds. Respondent closed the Aurora account in October 1974. He believes that he transferred the funds to the Harris account, but the bank records are not available to confirm this belief. Although respondent is adamant that he protected Monacelli's funds, he admits that he does not know what steps he took to protect the funds. Respondent finally sent Monacelli a check on August 12, 1975. However, the check was not drawn against the Harris account; it was drawn against the American account. He backdated the check to May 1975, but the American account was not even in existence in May. Respondent opened the American account in July 1975. On August 18, 1975, one week after respondent drafted the check to Monacelli, he deposited over $19,000 to cover the check, and $14,790 of that deposit was made in *currency*. Finally, respondent admitted that he was suffering financial hardship between June 1973, when he first received Monacelli's funds, and August 1975, when he finally paid Monacelli. Although circumstantial, this evidence supports the finding that respondent converted Monacelli's funds between June 1973 and August 1975. Circumstantial evidence is legal evidence, and we need not be naive or impractical in appraising an attorney's conduct. *In re Krasner* (1965), 32 Ill. 2d 121, 127; *In re Agin* (1970), 45 Ill. 2d 126, 130.

Furthermore, this court has repeatedly upheld findings of conversion when the balance in a bank account falls below the amount entrusted to the lawyer. (*In re Ushijima* (1987), 119 Ill. 2d 51, 57; *In re Young* (1986), 111 Ill. 2d 98, 104.) On August 12, 1975, the balance in

the American account fell far below the amount respondent owed to Monacelli. Respondent subsequently made a deposit to cover his check payable to Monacelli. This deposit was largely a currency deposit, which demonstrates that respondent did not maintain Monacelli's funds in a separate bank account. A conversion of funds therefore took place when the balance in the American account dropped below the amount respondent owed to Monacelli.

The evidence in the record also supports the finding that respondent converted Riley's funds. In September 1975, respondent received a settlement check in the amount of $5,800 and he deposited it in the American account. In November 1975, the American account was overdrawn. On numerous occasions the balance in the American account dropped below $5,800. As we noted above, a conversion of funds takes place when the balance in the bank account falls below the amount entrusted to the lawyer. *In re Ushijima*, 119 Ill. 2d at 57.

Finally, the evidence in the record supports the finding that respondent filed false bankruptcy documents. Respondent did not list the settlement money owing to Riley as a debt, and he did not list the First Federal account, where Riley's funds were being held, as an asset. Respondent testified that he believed the funds belonged to Riley and it was his motive to protect those funds. Nevertheless, his failure to disclose the debt and the bank account was intentional. Furthermore, respondent did not list a transfer of funds from the First Federal account to the Bank Leumi account. Although his motive was to use these funds to pay his attorney fees, his failure to disclose this transfer of funds was also intentional. Conduct such as this cannot be condoned and is prejudicial to the administration of justice. DR 1—102(A)(5); see 107 Ill. 2d R. 1—102(a)(5).

The Hearing Board in the instant case concluded that the Administrator did *not* prove, by clear and convincing evidence, that respondent converted Monacelli's and Riley's funds and that he filed false bankruptcy documents. Respondent contends that the Review Board erred in not giving due deference to the findings of the Hearing Board. We disagree.

Although this court and the Review Board give considerable deference to the Hearing Board's findings, neither this court nor the Review Board is required to accept them when the Hearing Board's conclusion is not supported by clear and convincing evidence. (*In re Levin* (1984), 101 Ill. 2d 535, 539-40.) The Hearing Board's conclusion in the instant case was not supported by clear and convincing evidence. In fact, one member of the Board wrote a harsh dissent and opined that respondent's conduct warrants disbarment. The Review Board unanimously decided to adopt the findings of the dissent and recommended that respondent be suspended from the practice of law for a period of three years.

In making its determination, the Hearing Board stated that the only evidence of conversion was circumstantial. However, this court has previously held that circumstantial evidence is legal evidence and can therefore be used to support a finding of a disciplinary violation. (*In re Krasner* (1965), 32 Ill. 2d 121, 127.) Furthermore, the Hearing Board failed to recognize the direct evidence of conversion of funds when the balance in the bank accounts fell below the amount entrusted to respondent. (*In re Ushijima*, 119 Ill. 2d at 57.) Finally, the Hearing Board ignored the fact that respondent's failure to disclose certain information on his bankruptcy petition was intentional.

We turn now to a consideration of the appropriate sanction. The purpose of attorney disciplinary proceedings is to safeguard the public and maintain the integrity

of the legal profession. (*In re Rolley* (1988), 121 Ill. 2d 222, 235.) Although we strive for consistency in the sanctions ultimately imposed, we recognize that each case of attorney misconduct is unique and requires an independent evaluation of its relevant circumstances. *In re Cheronis* (1986), 114 Ill. 2d 527, 535.

The Administrator urges this court to uphold the three-year suspension recommended by the Review Board. In support thereof, the Administrator argues that commingling and conversion are serious violations of the Code and, absent mitigating circumstances, warrant disbarment. (*In re Woldman* (1983), 98 Ill. 2d 248, 257.) The Administrator further recommends that respondent be required to make restitution for the excessive fee that he charged Monacelli.

Respondent agrees that he did charge an excessive fee, but he explains that, as he was inexperienced in handling probate and real estate matters, he was unaware of the appropriate fee schedules. He also emphasizes that Monacelli never complained to him about the fee. Nevertheless, respondent agrees that it would be appropriate to make restitution to Monacelli.

However, respondent contends that any sanction should be limited to censure or, at the very most, a three-month suspension. In support thereof, he argues that the conversion of funds was merely a technical conversion. Respondent cites *In re Clayter* (1980), 78 Ill. 2d 276, and *In re Cheronis* (1986), 114 Ill. 2d 527, for the proposition that a conversion of funds is only a *technical conversion* when the balance in the bank account falls below the amount entrusted to the attorney. In *Clayter*, this court ordered the attorney censured for conduct amounting to a technical conversion. (*Clayter*, 78 Ill. 2d at 283.) In *Cheronis*, this court ordered the attorney suspended for a three-month period for conduct amounting to a technical conversion, and for failing to repay his cli-

ent until several months had passed. (*Cheronis*, 114 Ill. 2d at 537.) We do not agree that these cases are analogous to the instant case.

Respondent commingled Monacelli's funds with his own and he allowed the balance to drop below the level entrusted to him. *In addition*, Monacelli's funds could not be traced between October 1974 and August 1975. Although respondent testified that he safeguarded the funds during that period, there is overwhelming evidence that he converted the money and put it to his own use. More significantly, Monacelli requested her funds from the real estate sale in *July 1973*, but respondent did not send them to her until *August 1975*, more than two years after her request. When respondent did finally send the funds, he promised to pay the interest on the funds during the two-year period in which he held them. He did not send the interest until *1986*. These delays constitute serious violations of the Code of Professional Responsibility (DR 9—102(C)(4); see 107 Ill. 2d R. 9—102(c)(4)), and demonstrate a complete lack of respect for respondent's client. Unprofessional behavior such as this tends to bring the entire legal profession into disrepute and cannot be countenanced. See *In re Enstrom* (1984), 104 Ill. 2d 410, 418.

Furthermore, respondent commingled Riley's funds with his own and he failed to maintain the proper balance in the account. *In addition*, respondent received Riley's settlement funds in 1975, but he did not forward them until 1982. Respondent sent Riley the funds on his own initiative *after* Riley filed his complaint with the ARDC. Although there was a legitimate dispute between respondent and Riley as to the amount of the settlement, respondent should not have retained the funds in his personal bank account, in limbo, for nearly seven years. DR 9—102(C)(4); see 107 Ill. 2d R. 9—102(c)(4).

Finally, respondent failed to disclose certain information on his own bankruptcy petition. As we noted above, such conduct is prejudicial to the administration of justice. DR 1—102(A)(5); see 107 Ill. 2d R. 1—102(a)(5).

In mitigation, respondent states that he was unaware of the requirement of the Code of Professional Responsibility to segregate client funds. He maintains that he has since opened an attorney-client trust account. Respondent's lack of knowledge does not excuse his conduct, as it is the "paramount obligation of each member of the bar to study the Code of Professional Responsibility and abide by its terms and principles." *In re Cheronis* (1986), 114 Ill. 2d 527, 535.

We do recognize that respondent has maintained himself with absolute candor throughout these proceedings and has had four character witnesses testify to his good reputation for honesty and integrity. In addition, the violations took place 12 to 15 years ago. Respondent has since made restitution to Riley. He also has begun to make restitution to Monacelli with respect to the interest on the sale of the residence, and he has agreed to make restitution with respect to the excessive fee that he charged.

For the reasons set forth above, it is the order of this court that respondent be suspended from the practice of law for a period of three years, conditioned upon his paying to Carolyn Monacelli, within one year from the date of this opinion, the sum of $10,000, plus interest at the rate of 6% per annum from August 12, 1975, to September 30, 1977, and at the rate of 8% per annum from October 1, 1977, to December 31, 1979, and at the rate of 9% per annum from January 1, 1980, to the date of payment. Upon making restitution required by this opinion, respondent shall file proof of having made restitution with the ARDC and the clerk of this court. This sum of $10,000 represents the amount of the excessive

fee as was agreed upon by respondent and the Administrator. These rates of interest were the statutory rates throughout the period in dispute. Prior to the resumption of the practice of law, respondent shall satisfy the Administrator of the ARDC and this court that payment as herein directed has been made.

*Respondent suspended.*