(No. 71189.—

*In re* GARY LEE BLANK, Attorney, Respondent.

*Opinion filed November 27, 1991.—Rehearing*
*denied February 3, 1992.*

BILANDIC, J., joined by FREEMAN, J., concurring in part and dissenting in part.

Samuel J. Manella, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

James A. Brandvik, of Jacobson, Brandvik & Anderson, and Jeffrey B. Steinback and Leonard C. Goodman, of Genson, Steinback & Gillespie, of Chicago, for respondent.

JUSTICE CLARK delivered the opinion of the court:

On February 24, 1988, the Administrator of the Attorney Registration and Disciplinary Commission (Administrator) filed a seven-count complaint against respondent, Gary Lee Blank, who was admitted to the practice of law on November 16, 1970. The respondent was charged with violating Rules 1—102(a)(3), (a)(4) and (a)(5), 6—101(a)(3), 7—101(a)(1), (a)(2) and (a)(3), and 7—102(a)(8) of the Illinois Code of Professional Responsibil-

ity (107 Ill. 2d Rules 1—102(a)(3), (a)(4), (a)(5), 6—101(a)(3), 7—101(a)(1), (a)(2), (a)(3), 7—102(a)(8)). The Hearing Board recommended that the respondent be suspended for a period of two years and respondent filed exceptions. The Review Board adopted the Hearing Board's findings of fact and conclusions of law with respect to counts II through VII of the complaint and reversed the Hearing Board's findings regarding count I. The Review Board agreed with the Hearing Board's recommendation, and this court allowed the respondent's petition for leave to file exceptions to the report and recommendation of the Review Board (94 Ill. 2d R. 753(e)(6)). The issues for review are as follows: (1) whether the findings and recommendations of the Review Board of the Commission are supported by the evidence adduced at the hearing; (2) whether the admission into evidence of Administrator's Exhibit 58 was within the Hearing Board's discretion; and (3) whether the misconduct proven warrants that the respondent be suspended for a period of two years.

The facts as to the allegations contained in count I are as follows. On February 14, 1980, Marshall Teichner was suspended from the practice of law for a period of two years. At that time, Teichner tendered many of his remaining files to the respondent to work on during his suspension. After Teichner returned to practice in February 1982, a dispute arose between the two attorneys over fees on cases in which both claimed an interest. The dispute resulted in a lawsuit (Teichner lawsuit).

On November 1, 1983, during the pendency of the Teichner lawsuit, the respondent caused an account to be opened at the Gladstone-Norwood Bank, entitled the "Gary L. Blank, Ltd., Marshall I. Teichner Ltd., client fund account" (Gladstone account). The respondent and his office manager, Andrea Michna, were the only signatories on the account.

On December 29, 1983, pursuant to an order entered on the court's own motion, a trustee was appointed in the Teichner lawsuit to receive "sole custody of all attorneys fees collected on each case either previously assigned to or to be assigned to Gary Blank or Marshall Teichner by order of [the] court." The trustee was to deposit the funds into an account at the American National Bank (American account).

Thereafter, between December 30, 1983, and February 15, 1984, the respondent deposited six settlement checks into the Gladstone account (settlement checks). The settlement checks were made payable to the respondent, Teichner and others. The respondent disbursed the proceeds from the settlement checks to clients, paid any costs due, and took the balance as his fees.

The judge presiding over the Teichner lawsuit became aware of the settlement checks when he saw copies of them in the court file and noted the stamped endorsement on the settlement checks was that of the principals in the case before him. Believing the respondent's actions in depositing the settlement checks in the Gladstone account were in violation of the court's December 29 order, the judge brought the matter to the attention of the Administrator.

Subsequently, the Teichner lawsuit was settled. Part of the settlement included stipulations (Teichner stipulations) whereby Teichner acknowledged that the respondent had apparent authority to endorse the settlement checks and deposit them into the Gladstone account. Teichner relinquished any claim that he had in these checks.

At the hearing, the respondent testified that the settlement checks were not related to the Teichner litigation because the cases which were related to the settlement checks had not been assigned to either Teichner or the respondent pursuant to the December 29 order. In

his answer to the complaint filed by the Administrator, however, the respondent admitted that the settlement checks were the subject of the Teichner lawsuit.

Moreover, the respondent testified that the Teichner stipulations acknowledged his apparent authority to deposit the settlement checks into the Gladstone account. However, he testified on cross-examination that at no time did Teichner authorize him to open the Gladstone account and that all the arrangements for settlement and disbursement for the Gladstone account were handled by Michna.

The judge presiding over the Teichner lawsuit testified at the hearing that the respondent's actions were "a direct violation" of the court's December 29 order. He testified on cross-examination, however, that the December 29 order included only those lawsuits which the respondent and Teichner brought to his attention and that were in controversy, and not all lawsuits the respondent had been handling at the time of the Teichner lawsuit. He did not know whether he had entered an order on those cases that involved the settlement checks.

Count II alleged that client John Taylor retained the respondent to represent him in a malpractice action against Christ Hospital and Dr. Barbara McCreary (Taylor lawsuit). An action was filed on June 15, 1981. Christ Hospital was served with summons on January 4, 1982, and Dr. McCreary was served on January 21, 1982.

The action was dismissed with prejudice on September 2, 1982, pursuant to this court's Rule 103(b) (107 Ill. 2d R. 103(b)). On November 4, the respondent filed a motion to vacate the dismissal, which was denied. On December 20, the respondent filed a motion to reconsider the dismissal, but the court refused to hear the motion, finding that it did not comply with section 2—1401 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2—1401) and that it was not timely filed. In

January 1983, the respondent filed a petition for relief of judgment, which was denied. Taylor's claims are now time-barred.

At the hearing, the respondent testified that he had nothing to do with the Taylor lawsuit until September 1982 when he filed the motion to vacate the dismissal. The respondent testified that although the original complaint bears his signature, it was signed by someone other than himself. On cross-examination, the respondent testified that he signed the affidavit of compliance filed with the complaint.

Count III concerned a personal injury lawsuit filed by Teichner on behalf of Donald and Nancy Singer (Singer lawsuit). The lawsuit was filed on June 24, 1983.

On October 24, 1983, Teichner was served with interrogatories. On December 23, the trial court entered an order that all written discovery in the Singer lawsuit was to be completed within 28 days.

On April 26, 1984, the respondent was assigned the Singer lawsuit in compliance with the court's December 29, 1983, order. On that date, the respondent entered his appearance personally on behalf of the Singers. He then met with the Singers and attempted to reconstruct the file, which he maintains Teichner retained.

As of September 19, 1984, the respondent had failed to answer the interrogatories in the Singer lawsuit. On that date, opposing counsel sought to have the matter dismissed with prejudice due to the respondent's failure to comply with discovery. On December 5, the case was dismissed *without* prejudice and opposing counsel's motion to dismiss with prejudice was continued until January 18, 1985.

On January 18, the court granted the respondent an additional 60 days to answer the interrogatories. The court also continued opposing counsel's motion to dismiss with prejudice until March 18.

On March 19, the court dismissed the Singer lawsuit with prejudice. The respondent filed a petition to vacate the dismissal, which was denied. He then appealed the order denying the petition to the Illinois appellate court, which affirmed the dismissal on the basis that the respondent had not adequately answered the interrogatories. (*Singer v. Treat* (1986), 145 Ill. App. 3d 585, 592.) At the hearing and in his brief to this court, the respondent maintains that the answers to the interrogatories were complete and satisfactory.

Count IV charged the respondent with misrepresenting to his client that he was proceeding to obtain financing for the client and failing to make a refund of a retainer when the client learned that the respondent had not performed the services that he was retained to perform.

On August 18, 1986, Dr. Harold Pates retained the respondent to obtain refinancing on property he owned in Palm Springs, California. Pates tendered $2,500 to the respondent as his fee. In a letter dated November 14, 1986, the respondent asked Pates to provide him with a current financial statement, copies of his 1984 and 1985 tax returns, and a signed credit authorization. On November 17, Pates transmitted these documents to the respondent and requested a refund of the $2,500 if the refinancing was not obtained by November 29.

On December 1, Pates wrote to the respondent requesting a refund. On December 4, the respondent wrote to Pates informing him that a loan had been "established" for him and enclosed a transmittal from Eastern Credit Limited, Inc., which transmittal stated that the company was interested in the project. The respondent never returned any portion of the $2,500 paid by Pates, nor did he present Pates with an accounting. Pates never received refinancing through the respondent's services.

At the hearing, Pates testified that he sought the respondent's assistance in obtaining refinancing for his prop-

erty in Palm Springs because the interest rate on the property's mortgage was "unreasonably high." He testified that the copies of his current financial statement, his 1984 and 1985 tax returns, and a signed credit authorization he transmitted to the respondent on November 14 were the second set of these documents provided to the respondent, and that he had sent these same documents to the respondent sometime in September. Pates also testified that he contacted the respondent numerous times:

> "I was trying to push him a little bit because I was paying that 12½, 12¾ interest. And with each payment it was costing me money. *** Time was very important."

Pates testified that on one occasion he went to the respondent's office and was told by his secretary that the respondent was not in, although Pates saw him in the office.

At the hearing the respondent testified that Pates failed to deliver the requested financial information until November 17, 1986, although in his answer to the complaint, the respondent admitted that Pates supplied him with this information in September 1986. The respondent denied telling Pates "on numerous occasions" that the financing had been obtained. The respondent testified that he "did what [Pates] asked me to do" and that the loan for Pates' property could have closed in a "matter of weeks." Believing he had provided the services he had been retained to provide, the respondent saw no reason to refund the retainer. The respondent also testified that he returned all of Pates' telephone calls.

Count V concerns a bankruptcy proceeding filed on behalf of Terry Hawe. In April 1985, Terry Hawe, doing business as Hawe Construction, was in the construction and excavating business in western Illinois. At that time, Hawe paid the respondent $5,000 to file a chapter 11 bankruptcy petition, obtain a stay of the State proceeding regarding North Adams State Bank's possession of the

collateral, and obtain alternative financing. The respondent then requested an additional $2,500 from Hawe, which Hawe paid, as well as $100 in travel expenses. There was no written fee agreement. In addition, based on the respondent's referral, Hawe paid an individual named Albert Smith $2,500 in an effort to obtain refinancing for his business.

On April 10, the respondent filed a petition on behalf of Hawe in the United States Bankruptcy Court for the Northern District of Illinois. The petition indicated that the respondent had received a $500 fee for his services. The respondent filed the petition in the wrong judicial district, as both the North Adams State Bank and Hawe at all relevant times resided or were located in the Central District of Illinois. The Bank moved to transfer the cause to the Central District to Illinois, which motion was granted.

In May 1985, by way of an affidavit filed in the Central District bankruptcy court, the respondent again incorrectly represented that he had been paid $500 for his legal services on behalf of Hawe.

On May 8, the court ordered the respondent to file monthly financial reports by the 20th of each month, commencing on June 20, for each proceeding month. The court also ordered the respondent to file a plan of reorganization and a disclosure statement on or before September 3. As of August 1, the respondent had failed to file the required monthly financial statements.

On August 1, the respondent was ordered to show cause why the Hawe matter should not be dismissed for failure to file the required monthly financial statements. The respondent was ordered to appear before the court on August 22. The respondent did not appear before the court but instead wrote the court requesting a continuance. The court scheduled a conference call for September 3, 1985, among all the attorneys on the matter. The re-

spondent was unavailable for the scheduled telephone conference, testifying at the hearing that his telephone was out of order that day due to building repairs.

On September 4, on the court's own motion, the Hawe bankruptcy was dismissed. Hawe learned of the dismissal in a letter he received from the bankruptcy court. He never obtained financing to keep his business operating and never received any relief from the bankruptcy court after the matter was dismissed.

The respondent did not take any action to have the bankruptcy matter reinstated, although he testified that he made subsequent attempts to obtain refinancing for Hawe. Hawe requested on several occasions that the respondent refund some of the money he had paid to the respondent. The respondent did not refund any money to Hawe, nor did he ever give an accounting to Hawe.

Count VI involves a disbursement to Nicholas Mitchell, a chiropractor who rendered his services to some of the respondent's clients. On September 21, 1979, Theresa and Sylvia Colbert were involved in an automobile collision. Mitchell treated the Colberts for injuries sustained in the accident. The Colberts retained the respondent to represent them in a personal injury suit they filed after the accident.

In December 1983, the respondent settled the Colberts' claim. The settlement draft was made payable to the Colberts, the respondent and Mitchell. Thereafter, Michna affixed the signature of Mitchell to the Colbert settlement check and deposited the check into the respondent's client fund account at the Exchange National Bank (Exchange account). Thereafter, with the Colberts' consent, the respondent caused at least $450 of the settlement proceeds to be withheld to pay Mitchell.

On July 20, 1984, the balance in the Exchange account fell to zero. At no time did the respondent have authority

from the Colberts or Mitchell to use the funds due Mitchell for his own personal use.

On December 11, 1985, Mitchell wrote a letter to the respondent indicating that he had learned that the Colbert case had been settled. This letter also indicated that Mitchell had not been paid any portion of his fees for treating the Colberts. On June 17, 1986, the respondent tendered $450 to Mitchell.

At the hearing, Michna testified that Mitchell would have been aware that, in affixing his signature to the settlement draft, she was acting pursuant to a standard office procedure. She also testified, however, that she could not recall having a specific conversation with Mitchell regarding her affixing his signature to the Colbert settlement draft. Mitchell testified that he never authorized anyone involved with the respondent's office to sign his name to the Colbert settlement draft.

The respondent testified that he had no personal knowledge of how the Colbert settlement funds were disbursed and that Michna handled the disbursement of funds. The respondent further testified that when he was advised by Mitchell that he had not been paid, he transmitted a check for $450 to him.

Count VII involves another disbursement to Mitchell. On September 18, 1976, Dennis Godfrey was involved in an automobile collision. Mitchell treated Godfrey for injuries he sustained in the accident.

In November of 1982, the respondent became Godfrey's attorney. The respondent settled Godfrey's personal injury claim. The settlement draft was made payable to Godfrey, the respondent and Mitchell. Upon receipt of the draft, Michna affixed the signature of Mitchell to the draft and deposited the draft in the respondent's client fund account at Continental Bank in Chicago (Continental account). Thereafter, with Godfrey's consent, the respondent

caused $933 of the settlement proceeds to be withheld to pay Mitchell.

On May 9, 1983, the balance in the Continental account fell to zero. At no time did the respondent have the authority from Godfrey or Mitchell to use the funds due Mitchell for his own personal use.

On December 11, 1985, Mitchell wrote the respondent a letter indicating that he had learned that the Godfrey matter had been settled and that he had not been paid the $933 which he was owed for treating Godfrey. As of the date of the hearing before the Hearing Board, August 17, 1989, Mitchell had not been paid any portion of the $933.

At the hearing, Michna testified that Mitchell would have been aware that, in affixing his signature to the settlement draft, she was acting pursuant to a standard office procedure. She testified that she could not recall having a specific conversation with Mitchell regarding her affixing his signature to the Godfrey settlement draft. Dr. Mitchell testified that he never authorized anyone involved with the respondent's office to sign his name to the Godfrey settlement draft.

The respondent testified that he had no personal knowledge of how the Godfrey settlement funds were disbursed because Godfrey was Teichner's client and the respondent had nothing to do with the disbursement of funds. Teichner, however, was not a signatory on the respondent's client fund account at Continental Bank. The respondent and Michna were the only signatories on the account.

Two character witnesses testified on the respondent's behalf. The witnesses, two judges of the circuit court of Cook County before whom the respondent had appeared on a number of occasions, testified that the respondent's reputation for truth and veracity and honesty and fair dealing was good. Neither judge had any knowledge of the charges pending against the respondent.

The first question is whether the findings and recommendations of the Review Board of the Commission are supported by the evidence adduced at the hearing. As noted above, the Review Board adopted the Hearing Board's findings of fact and conclusions of law with respect to counts II through VII of the complaint and reversed the Hearing Board's findings regarding count I.

As this court has previously stated, the Hearing Board is in a superior position to resolve factual disputes; its determinations regarding the credibility of witnesses, the resolution of conflicting testimony, and any other fact-finding judgments are entitled to great deference. (*In re Kitsos* (1989), 127 Ill. 2d 1, 9-10; *In re Joyce* (1989), 133 Ill. 2d 16, 29-30.) However, this court will not accept the Hearing Board's findings unless they are established by clear and convincing evidence. *In re Levin* (1984), 101 Ill. 2d 535, 539-40; *In re Kink* (1982), 92 Ill. 2d 293, 301; 107 Ill. 2d R. 753(c)(6).

The record before us is replete with contradictory testimony. The respondent does not admit to any wrongdoing in any instance although he presented no (credible) evidence to support his testimony or to contradict the allegations of the complaint. Our review of the evidence presented in this case reveals no reason to disturb the findings of the Hearing Board with regard to counts II through VII, as we find that they are supported by the facts in the record and established by clear and convincing evidence. With respect to count I, we adopt the reasoning of the Review Board.

The Hearing Board concluded that the respondent's conduct in count I violated Rule 1—102(a)(4), which provides that "[a] lawyer shall not *** engage in conduct involving dishonesty, fraud, deceit, or misrepresentation," and also Rule 7—102(a)(8), which states that "[i]n his representation of a client, a lawyer shall not *** knowingly engage in other illegal conduct or conduct contrary to a

disciplinary rule." The Review Board concluded that the evidence is not clear and convincing to prove a violation of either of these rules. At the most, according to the Review Board, the evidence shows that the respondent may have violated a court order to deposit the checks with the designated trustee although even this possibility is not proven by the evidence. The evidence shows that the judge whose order was allegedly violated took no action to question the respondent or determine if the court's order was in fact violated. Moreover, Rule 7—102(a)(8) does not appear to be involved since the conduct does not involve a client and there is no evidence that the respondent's conduct was illegal or contrary to a disciplinary rule.

With respect to count II, the respondent testified that he was unaware that he had been retained to represent Taylor, yet his signature appears on the complaint and the affidavit of compliance filed in the matter. He testified that the signature on the complaint was executed by someone other than himself. Even if we were to accept this testimony, the respondent acknowledged signing the affidavit of compliance filed with the complaint, in which case we are left to conclude that the respondent was untruthful when he denied being aware that he had been retained by Taylor or that he was untruthful on the affidavit. His conduct in either alternative was unethical and unprofessional. The respondent's failure to pursue to completion the motion to vacate the dismissal of the matter resulted in Taylor's claims against Christ Hospital and McCreary being time-barred.

As to the allegations in count III, the respondent testified that he had difficulty reconstructing the Singer case file because Teichner retained it. His secretary during the pendency of the Singer lawsuit also testified that it was difficult to gather missing information in the case. Nonetheless, the respondent had nearly one year from the time he filed his appearance on behalf of the Singers until the

case was dismissed to answer the interrogatories. Moreover, when the respondent assumed the case, he was aware, or should have been, that the court had already ordered the completion of all written discovery and that expediency on this matter was required. When the respondent eventually completed the interrogatories, he answered many of the interrogatories with vague, general responses and attached to them 23 pages of "unverified, unidentified documents not specifically referred to or described in the answers." (*Singer v. Treat* (1986), 145 Ill. App. 3d 585, 592.) We do not consider such a practice to be an acceptable substitute for the answers required by our Rule 213(c) (107 Ill. 2d R. 213(c)).

With respect to count IV of the complaint, although the respondent denied ever advising Pates prior to November 26, 1986, that the refinancing had been approved, it is apparent in a letter dated November 12, 1986, from the respondent to Pates that the respondent made representations that the refinancing either had been obtained or was imminent. The transmittal the respondent sent Pates on December 4, 1986, which the respondent advised Pates established a loan, did not do so, as is apparent from the face of the document.

Under other circumstances a delay of four months may not be egregious, but in the present circumstances, time was of the essence for Pates. As he indicated in his testimony, he was seeking to lower his monthly interest payment and each passing month added to the interest he was paying. We agree with the Hearing Board's finding that while it is clear that the respondent neglected Pates' matter in terms of achieving a result for his client, this neglect was aggravated by his false and misleading statements to Pates and his failure to promptly respond to Pates' inquiries.

With respect to count V, it is apparent from Terry Hawe's testimony that the respondent did not adequately

explain to Hawe what the bankruptcy proceedings entailed, and what past, current and future financial information would be needed in order to set up a reorganization plan. Hawe testified that at his first meeting with him, the respondent informed him that his fee was $5,000 to help Hawe "save his business" although neither the respondent's nor Hawe's testimony indicated that the respondent elicited enough information to realistically determine if anything could be done to salvage Hawe's business. The respondent then put Hawe in contact with an individual purportedly able to obtain financing for him. Instead, Hawe paid this individual $2,500 as a refinancing service charge and never received the refinancing. It is unclear what, if anything, this individual did to earn his fee or if Hawe achieved any benefit from this referral.

Hawe testified that the respondent had him sign a blank chapter 11 bankruptcy petition. This petition, as well as the one subsequently filed in the correct district, misrepresented to the court the amount of fees the respondent received from Hawe. The respondent testified that both errors were clerical, although we agree with the Hearing Board's finding that these misrepresentations were either intentional or grossly negligent in that the respondent failed to review the materials he signed and submitted to a court.

After the bankruptcy proceeding was transferred to the Central District, the court ordered that monthly income and expense reports be filed, beginning with April 1985. Respondent testified that he submitted monthly financial reports for April and May, but he agreed that no reports were filed for June and July. The record does not reveal that reports were filed for May and June and the respondent did not present any documentary evidence to the contrary. The respondent argued that a document covering the time period from April 13 to May 13, 1985, demonstrated that the required monthly financial reports the

court ordered were in fact filed. Even if it were true, as argued by the respondent, that the bankruptcy court erred in dismissing the case for failure to file the May and June reports, the respondent did nothing to appeal that erroneous determination.

The respondent never had a written fee agreement with Hawe and never gave Hawe an accounting of how he expended his time on Hawe's matter. While it appears to be true that the respondent did some work on Hawe's case, it is uncertain whether any of the work in any way benefitted Hawe, particularly after the respondent took $7,600 in fees and expenses from Hawe when his financial situation was already precarious.

With respect to count VI, the Hearing Board concluded the following:

> "With respect to Mitchell's testimony, it is clear that Mitchell had in fact authorized Michna to sign his name to settlement drafts in order to facilitate payment to him and clients after cases were settled."

We agree with this conclusion. Although neither Mitchell nor Michna could recall the conversations whereby Mitchell authorized Michna to execute the Colbert and the Godfrey settlement drafts, it is clear that it was standard procedure for Michna to sign Mitchell's name to settlement checks to facilitate negotiating the draft and forwarding the money to the appropriate parties, including Mitchell. Michna testified that she "probably had several conversation with [Mitchell] over the years" regarding this procedure.

With respect to the Colberts, the respondent testified, without any supporting documentation, that Mitchell was originally paid $450 at or near the ·time the settlement proceeds were disbursed. However, he claims Mitchell did not cash the check or it was somehow lost. The respondent then offered that over two years later when Mitchell inquired as to why he had not been paid, a check was imme-

diately sent to Mitchell. The fact that Mitchell was eventually paid does mitigate the original conversion, but the respondent's use of this money for over two years before he eventually paid Mitchell is conversion nonetheless.

With respect to the $933 withheld to pay Mitchell from the Godfrey settlement, it is undisputed that the settlement amount was deposited into the respondent's client account, that Mitchell was never paid, and that the balance in the respondent's account fell to zero. The respondent clearly converted the money withheld from Godfrey to pay Mitchell. The fact that the respondent never paid Mitchell after he brought this failure to the respondent's attention aggravated the conversion.

The respondent claimed that Mitchell was paid for his treatment of Godfrey, but he provided no documentation to support his claim. The complaint in the instant case was voted nearly two years prior to a hearing on the matter. We believe that the respondent had more than ample time to gather documentary evidence to support his claim that Mitchell had been paid.

The second issue for our consideration is whether the Hearing Board's decision to allow Administrator's Exhibit 58 into evidence was proper. At the hearing, the Administrator called the respondent as an adverse witness. The Administrator introduced Exhibit 58, a certified copy of an affidavit executed by the respondent on February 22, 1989, and filed on August 29, 1989, in Tennessee. The affidavit was filed for purposes of allowing the respondent to appear as co-counsel on a matter being prosecuted in Tennessee. In the affidavit, the respondent stated that there were "no disciplinary actions or proceedings being conducted against him." The affidavit was executed a little over one year after the instant complaint had been filed against the respondent.

Counsel for the respondent objected to the introduction of the affidavit on the basis that he had not previously

seen the document and because it was not relevant to the charges in the complaint. The panel overruled the objections and allowed the affidavit in, stating that it went to the issue of the respondent's credibility. The respondent testified that he signed and filed the affidavit in the Tennessee proceeding.

In *In re Samuels* (1989), 126 Ill. 2d 509, this court recognized that disciplinary proceedings are neither civil nor criminal and governed solely by this court's rules and decisions. *In re Samuels*, 126 Ill. 2d at 522 ("Attorney disciplinary proceedings are *sui generis* resulting from this court's inherent power to regulate the practice of law. As such, they are neither civil nor criminal in nature, and are governed by this court's rules and decisions"); see *In re Ettinger* (1989), 128 Ill. 2d 351.

In civil cases, a party may call an adverse party or person treated as an adverse party and examine the witness in accordance with section 2—1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—1102). This section also applies in attorney disciplinary proceedings. (*In re Eaton* (1958), 14 Ill. 2d 338, 343 (under former section 60 of the Civil Practice Act (Ill. Rev. Stat. 1981, ch. 110, par. 60)); see also M. Graham, Cleary & Graham's Handbook of Illinois Evidence §607.4 (5th ed. 1990).) The party calling the adverse witness may impeach the witness by proof of prior inconsistent statements. Ill. Rev. Stat. 1989, ch. 110, par. 2—1102.

*In re Melin* (1951), 410 Ill. 332, held that common law rules of evidence apply to disciplinary proceedings. In *In re Heidrich* (1956), 10 Ill. 2d 357, 367, however, this court held that the rules need not be strictly applied in attorney disciplinary cases (*In re Silvern* (1982), 92 Ill. 2d 188, 196; see also *In re Yamaguchi* (1987), 118 Ill. 2d 417), and more recently, in *In re Ettinger*, this court concluded that the admission of evidence in a disciplinary proceeding is a

matter within the sole jurisdiction of this court. *In re Ettinger*, 128 Ill. 2d at 365.

Letters and affidavits have been considered in previous attorney disciplinary cases, although not always as evidence to impeach the respondent. Under the circumstances, however, we believe the hearing panel had the discretion to admit the affidavit into evidence. See *In re Silvern*, 92 Ill. 2d at 196.

The final issue we must consider is the sanction warranted by the respondent's misconduct. Attorney disciplinary proceedings are intended "to safeguard the public, to maintain the integrity of the profession, and to protect the administration of justice from reproach." (*In re Lenz* (1985), 108 Ill. 2d 445, 450-51.) There must be a degree of consistency in the sanctions imposed for similar misconduct in order to ensure predictability and fairness in future disciplinary matters. (*In re Hopper* (1981), 85 Ill. 2d 318, 324.) Each case, however, must be resolved on the facts and circumstances peculiar to it. (*In re Ushijima* (1987), 119 Ill. 2d 51, 57.) In the present case, both the Hearing and Review Boards recommended that respondent be suspended from the practice of law for a period of two years.

The respondent argues that a two-year suspension is excessive. Respondent cites *In re Fox* (1988), 122 Ill. 2d 402, in which an attorney received an 18-month suspension for neglecting three client matters and misrepresenting the status of a matter to one of the three clients. Unlike the respondent, however, attorney Fox was not a recidivist. (In 1984, this court censured the respondent for the "mishandling" of a client's funds (*In re* Blank, No. M.R. 3232).) Moreover, not only was the respondent found to have neglected three client matters, but also he has been found to have converted funds on two occasions, and engaged in conduct involving dishonesty, fraud, deceit or misrepresentation.

Attorney misconduct involving commingling and conversion of client funds may be grounds for disbarment, absent mitigating circumstances. (*In re Kitsos* (1989), 127 Ill. 2d 1, 10; *In re Levin* (1987), 118 Ill. 2d 77, 88.) The respondent argues that the Hearing Board ignored the impact of the Teichner litigation on the respondent and the problems which resulted as a consequence of the litigation. We disagree. The Hearing Board did not ignore the impact of the litigation on the respondent's activities, but in fact found as a factor in aggravation that the respondent failed to recognize his own improper conduct and attempted to blame his problems on Teichner. We note in mitigation that with respect to the Colbert funds, Mitchell was eventually paid his fees.

In *In re Levin*, this court addressed the issues of conversion, neglect, misrepresentation and recidivism. This court expressed its concern that the previous disciplinary sanctions had failed to deter Levin from continuing to neglect his clients' affairs and disbarred the attorney from the practice of law.

Considering the gravity of the offenses, we are convinced that disbarment is appropriate.

*Respondent disbarred.*

JUSTICE BILANDIC, concurring in part and dissenting in part:

I concur that the respondent should be disciplined for the misconduct found by the Hearing and Review Boards. However, because I believe the discipline recommended by both Boards, two years' suspension, should be imposed, I dissent from that portion of the court's judgment disbarring the respondent from the practice of law.

JUSTICE FREEMAN joins in this partial concurrence and partial dissent.