(No. 74928.—

*In re* LEONARD T. TIMPONE, Attorney, Respondent.

*Opinion filed September 23, 1993.—Rehearing
denied November 29, 1993.*

McMORROW, J., took no part.

Ellyn S. Rosen, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

George B. Collins and Theresa M. Gronkiewicz, of Collins & Bargione, of Chicago, for respondent.

JUSTICE NICKELS delivered the opinion of the court:

The Administrator of the Attorney Registration and Disciplinary Commission (ARDC) filed a 12-count, second-amended complaint against respondent, Leonard T. Timpone, on March 8, 1991. The 12-count complaint charged respondent with a variety of misconduct involving seven clients, and included charges of commingling and conversion of client funds. A hearing on the matter was conducted on July 9, 10, and 23, 1991. The Hearing Board dismissed several of the charges against respondent but found that he had engaged in the following acts of misconduct: commingling client funds, conversion of client funds, failing to maintain complete records of client funds, disregarding a tribunal's orders, deceit in handling his client fund account, misrepresenting a matter in a written statement submitted during an ARDC investigation, failing to promptly pay client funds, and neglecting several clients' proceedings. The Hearing Board recommended that respondent be suspended from the practice of law for one year and until further order of this court. The Review Board adopted the Hearing Board's findings of fact, but recommended that respondent be suspended for only six months. The Administrator has filed exceptions with this court.

## BACKGROUND

Respondent graduated from John Marshall Law School and was licensed to practice law in Illinois in 1970. Respondent concentrates his practice in the domestic relations area and has been associated with several attorneys during the time relevant to these proceed-

ings. According to the evidence presented at the disciplinary hearing, respondent's practice is hectic. In an average year, respondent is involved in the entry of 100 to 125 decrees in the domestic relations division of the circuit court of Cook County, and tries about 110 to 120 divorce cases. Respondent also generally has about 175 predecree cases and 200 post-decree cases pending at any one time. To keep up with this work, respondent usually begins his day at 4:30 in the morning, and works until 7:15 in the evening. Respondent also receives phone calls and visits from clients at home. Respondent does not enter into written fee agreements with clients and keeps track of the time spent on cases by making notations on the client's files.

Respondent is a member of the Academic Board of Marian Catholic High School and scouts football games for the high school. Respondent also coaches several youth sports teams, officiates for neighborhood athletic leagues, and raises funds for the high school. Finally, respondent is a member of the Olympia Fields Country Club.

## Findings of Misconduct

The Hearing Board found that respondent engaged in misconduct with regard to the following clients.

### I. *Rose Lietza*

Counts I and II of the Administrator's complaint charged respondent with, *inter alia,* conversion of client funds, failure to maintain complete records of client funds, disregarding court orders, and making false, misleading statements to the ARDC. Rose Lietza retained respondent in a difficult divorce action with a $1,500 retainer fee in 1986. On December 30, 1986, the trial court entered an order directing respondent to hold the proceeds of the sale of Lietza's marital residence in escrow.

A January 8, 1987, court order dissolved Lietza's marriage and provided that the proceeds from the sale of the marital home were to be divided equally. On that same day, respondent closed the sale of Lietza's marital home. Respondent deposited the net proceeds from the sale of Lietza's house into his client fund account and issued checks from those funds at Lietza's instructions. Among the checks issued was one to respondent's law firm in the amount of $6,359.00 for attorney fees. After this disbursal, $18,665.59 remained from the sale of Lietza's marital residence.

In February 1987, respondent advised Lietza that her husband would probably attempt to vacate the January 8, 1987, judgment for the dissolution of marriage and try to enjoin her from using the remaining sale proceeds. Respondent suggested that Lietza protect the proceeds by entrusting the money to him. By doing so, respondent advised, Lietza would keep the money from her husband and make it available for future litigation expenses. On February 9, 1987, Lietza wrote respondent instructing him to place the money in a "six-month holding account." Respondent kept the money in his client fund account.

According to respondent, Lietza authorized him to use the $18,665.59 as prepaid attorney fees and to pay her husband if later litigation so required. Under this agreement, Lietza was to receive any remaining amount of the money after legal expenses and any payments to her husband. Lietza testified that she gave respondent no such authority.

On February 5, 1987, Lietza's husband moved to vacate the judgment for dissolution of marriage and to redistribute the marital home's sale proceeds. On February 11, 1987, the court ordered Lietza to make an accounting of the marital residence sale proceeds. No such ac-

counting was made. The court ordered Lietza not to dispose of the marital residence on March 13, 1987.

On April 23, 1987, respondent wrote an $18,000 check on his client fund account to pay another client's real estate taxes. This payment depleted respondent's client fund account to an amount less than $6,000, well below the $18,665.59 he was holding in that account for Lietza. By July 1987, respondent admitted, no proceeds remained from the sale of Lietza's marital property in his client fund account.

Lietza wrote to respondent several times in August 1988, inquiring about the funds, but received no response.

A settlement was reached in Lietza's divorce on September 26, 1988, in which Lietza was to pay her husband an additional $9,600. Respondent paid this amount in installments.

On September 26, 1988, Lietza filed a charge against respondent with the ARDC because she felt respondent was not keeping her informed of her divorce proceedings. Later, in December 1988, Lietza met with respondent to discuss her case. Lietza testified that respondent informed her that he would not bill her any further and that he would return to her all the money remaining in the "escrow account." Respondent never made an accounting to Lietza.

On January 24, 1989, Lietza wrote respondent again asking that he send her the amount remaining in her escrow account and confirming that there would be no attorney fees deducted from the escrow balance. Respondent answered by offering to make an accounting of all monies Lietza had on deposit.

In August 1989, Lietza again wrote respondent, asking him for $8,000, the amount she believed was remaining from the sale of her marital assets. Respondent offered to draft a note in which he would pay Lietza

$1,000 a month for eight months. As part of this agreement, respondent asked Lietza to sign a form acknowledging that neither party would owe each other any money after the payments. Lietza refused to accept the $8,000 under these circumstances, but as of the time of the disciplinary hearing, had not asked respondent for the money and had not commenced any legal proceedings seeking return of the money.

Respondent testified that he intended the $8,000 offer to be a gift because he felt sorry for Lietza due to her difficult divorce and other problems she had. Respondent also testified that he had spent about 75 hours on Lietza's case for which he had not billed her and had stopped keeping time records in the case because he did not believe he could collect any money from Lietza. Respondent believed that he was entitled to keep as attorney fees the $6,600 to $8,000 he estimated remained from the $18,665.59.

The Hearing Board concluded that an understanding existed between respondent and Lietza in January and February 1987 in which respondent would "hold" the $18,665.59 to keep it beyond the jurisdiction of the court in Lietza's marriage dissolution proceedings. This money would be used in part to pay respondent's legal fees at the conclusion of Lietza's marriage dissolution. The Hearing Board further found that while the February 11, 1987, order for an accounting of the marital residence and the March 13, 1987, order directing Lietza not to dispose of those proceeds technically applied only to Lietza, respondent was on notice as early as February 11, 1987, and was under an obligation as an officer of the court not to dispose of what remained of the sale proceeds until further order of the court. The Hearing Board noted that these funds were not respondent's to use as he saw fit, but were instead subject to the direction of his client and the court. The funds were to be

held by respondent, not disposed of. The Hearing Board concluded that respondent used the funds to pay another client's tax bill, which constituted conversion of client funds. The Hearing Board also found that respondent disregarded a tribunal's rulings during the course of a proceeding in violation of Rule 7—106(a) of the Code of Professional Responsibility (107 Ill. 2d R. 7—106(a)).

The Hearing Board also concluded that Lietza knew that she would owe respondent a fee at the conclusion of the dissolution proceedings. This conclusion was buttressed by the fact that even after respondent agreed to waive his fee and pay Lietza $8,000, Lietza did not accept his offer, did not again ask for money, and did not file suit against respondent for the money.

Next, the Hearing Board found that respondent made no accounting to Lietza of the disposition of the marital residence proceeds and had no records to verify what happened to the money. The Hearing Board concluded that in the absence of records to support his estimates, respondent failed to maintain complete records of client funds coming into his possession in violation of Rule 9—102(c)(3) and failed to make an accounting prior to claiming fees from client funds. 107 Ill. 2d R. 9—102(c)(3); see *In re Soloman* (1987), 118 Ill. 2d 286.

Finally, with regard to Lietza, count II charged respondent with sending the ARDC a letter on October 24, 1988, in response to Lietza's charges, which stated: "I presently have some funds which are being held for her." The ARDC found this to be a misrepresentation in violation of Rule 1—102(a)(4) because when written and sent, respondent was not in possession of any of Lietza's funds, having already used them without authority. 107 Ill. 2d R. 1—102(a)(4).

## II. *Richard Olson*

Count XII of the Administrator's complaint charged

respondent with conversion of at least $26,252.22 of a client's, Richard Olson's, money. Olson retained respondent in anticipation of a marriage dissolution, and respondent advised Olson to set aside funds to pay for the anticipated proceedings. Respondent suggested that he hold the funds for Olson. On July 17, 1984, Olson gave respondent $24,316 to hold in escrow. On April 23, 1985, Olson gave respondent an additional $29,936.22 to hold in escrow. Respondent deposited this money into one of his personal accounts. Several times after this, between August and October 24, 1985, Olson asked respondent to return $10,000. Respondent informed Olson that the funds were not readily available but gave no explanation for the funds' unavailability. By October 24, 1985, respondent had returned $10,000 to Olson in separate $5,000 checks. Later, in February, March, and April 1987, Olson asked respondent for $20,000 to help pay real estate taxes. On each occasion, respondent again informed Olson that the funds were not readily available but offered no explanation. However, on April 23, 1987, respondent tendered a check to pay Olson's taxes in the amount of $18,000.

Olson testified that he was not alarmed by the fact that he did not have ready access to his money. In fact, Olson had no objection to the way respondent handled his money. Olson had also not asked respondent to return any of the remaining money, even though he knew of the disciplinary charges against respondent. However, Olson did not give respondent authority to use any of his money for respondent's business or personal purposes.

The Hearing Board found that respondent's deposit of Olson's $54,252.22 into one of respondent's personal accounts constituted conversion of client funds. The Board also found that respondent participated in a diversion of Olson's funds from the jurisdiction of the court in anticipation of litigation.

The Hearing Board further found that respondent engaged in deceit in handling his client fund account with respect to reimbursements made to Olson in violation of Rule 1—102(a)(4). (107 Ill. 2d R. 1—102(a)(4).) The deceit involved paying Olson money from respondent's client fund account and representing the money was Olson's when respondent had not deposited any of Olson's money in the account.

### III. *Joseph Serpico*

Count X of the Administrator's complaint charged respondent with conversion of $5,455 of a client's, Joseph Serpico's, funds. Serpico retained respondent to represent him in his dissolution proceeding with a $1,000 retainer fee. Prior to the dissolution of marriage, a sale of household goods and furniture generated $5,455 in cash. On December 31, 1985, the court ordered the money from this sale placed in an escrow account. That same day, Serpico gave respondent a check for $5,455 and wrote "legal cost" on the check pursuant to respondent's advice.

Respondent placed the $5,455 in his client fund account and not in an escrow account. Serpico testified that he never gave respondent authority to use the money for respondent's personal or business purposes. Moreover, it was Serpico's understanding that the money would be placed in an escrow account until the conclusion of the litigation.

On January 18, 1986, respondent's client fund account fell to $5,327.12, an amount below the $5,455 Serpico had given him. Bank records revealed that this same account fell to a negative $0.77 by August 15, 1987, and that a later client trust fund opened by respondent was not opened using Serpico's funds.

An order for dissolution of marriage was entered on February 5, 1987, and provided that respondent was to

release the $5,455. Serpico testified that he requested the money from respondent on a number of occasions after the court's order and on October 4, 1989, wrote to him again requesting the funds and acknowledging $3,200 in legal bills. Serpico asked that respondent return $2,300 plus interest from the money held in escrow.

After requesting the money until February 13, 1990, with no success, Serpico filed suit against respondent for $2,320.70 plus costs. A default judgment was entered against respondent for the amount sought, but as of the date of the filing of the Administrator's complaint respondent had not yet satisfied the judgment. Prior to this judgment, respondent had sent Serpico several bills for legal services in the amount of $3,437.

Respondent testified that Serpico agreed to have his legal bills deducted from the $5,455. Respondent did not believe he owed Serpico money because the $5,455 plus retainer did not cover respondent's time and that, in fact, Serpico owed him money.

The Hearing Board found that respondent converted Serpico's funds when the balance of respondent's client fund account fell to an amount below the $5,455 Serpico gave respondent to hold. The Hearing Board also found that if it were not for this technical conversion, the dispute between respondent and Serpico could be described as a fee dispute. The Hearing Board further found that respondent's refusal to satisfy the judgment represented a failure to promptly pay or deliver to a client funds to which the client was entitled in violation of Rule 9—102(c)(4) (107 Ill. 2d R. 9—102(c)(4)).

## IV. *John Menor*

Count III of the Administrator's complaint charged respondent with failing to deposit $2,305 of a client's money into an escrow account and using the money for his own purposes without the client's permission. In the

course of representing John Menor in a divorce proceeding, respondent advised Menor to have respondent hold any cash Menor had in his possession. On February 12, 1987, Menor delivered $2,305 in cash to respondent's home, where respondent's wife received the money. The money consisted of one $1,000 bill, 10 $100 bills, two $50 bills, five $20 bills, five $10 bills, five $1 bills and 25 $2 bills. The receipt stated that the money was to be placed in an escrow account.

On February 13, 1987, the court ordered all cash monies held by the attorneys on behalf of their clients placed in the attorneys' escrow accounts. However, Menor's $2,305 was kept for a time at respondent's house and was later placed in a safe deposit box in respondent's wife's name until the divorce proceedings ended. The money was never placed in a special escrow account and after Menor's divorce proceedings, respondent told his wife that the money belonged to them.

Respondent testified that he believed Menor wished him to preserve the money in cash because of the uniqueness of the bills. Menor testified that there was no significance in the denomination of the cash and that he did not authorize respondent to place the cash in a safe deposit box.

Menor requested the return of his money on several occasions after the September 26, 1988, dissolution judgment and was told that a check had been mailed to him. Respondent finally sent Menor a check dated February 10, 1989, in the amount of $1,733.25. Respondent testified that the money was withheld to straighten out Menor's legal bill. However, it is undisputed that respondent never prepared a legal bill in connection with a final accounting in Menor's litigation. Menor expected respondent to return approximately $1,800.

The Hearing Board concluded that respondent never deposited Menor's money into an escrow account and

that respondent's belief that the money was unique was not supported by Menor. Even if the bills were unique, the Hearing Board found, it did not relieve respondent of his obligation to segregate the funds for safekeeping, which he did not do. The Board thus found that respondent commingled client funds in violation of Rule 9—102(a) and failed to maintain complete records of a client's funds and render appropriate accounts to the client regarding the funds in violation of Rule 9—102(c)(3) (107 Ill. 2d Rules 9—102(a), (c)(3)). The Hearing Board also found that respondent's delay in returning Menor's funds constituted a failure to promptly pay a client funds as requested by the client in the possession of a lawyer which the client is entitled to receive in violation of Rule 9—102(c)(4) (107 Ill. 2d R. 9—102(c)(4)).

## V. *Valerie Zara*

Count VII of the Administrator's complaint charged respondent with neglecting a dissolution of marriage petition. Valerie Zara retained respondent to represent her in her marriage dissolution proceedings in 1983. Respondent filed a petition for dissolution of marriage on behalf of Zara in Cook County on September 2, 1983. Discovery was completed in July 1984, and the case was assigned for trial on December 17, 1984. However, respondent failed to appear several times and the matter was eventually dismissed on April 31, 1986, for want of prosecution. Zara was later divorced in a 1987 proceeding initiated by her husband. Respondent testified that the neglect resulted from a confusing reorganization in the divorce courts and that he did not refile Zara's petition because Zara's husband's attorney agreed to file a petition and pay the filing fees.

The Hearing Board found respondent neglected Zara's petition for divorce in failing to reinstate the case within the time allowed once it was originally dismissed

in 1984. However, the Board found that respondent's conduct did not involve dishonesty, deceit, or misrepresentation.

## VI. *Albert Mulkey*

Albert Mulkey hired respondent's firm, Timpone & Rickelman, to represent him in a breach of contract proceeding in 1983. Respondent's partner, Leonard Rickelman, represented Mulkey in the action, but later left the firm and moved to California in 1986. Mulkey testified that Rickelman informed him that he would return to Chicago to try the case and that the firm would continue to represent him. Mulkey's case was dismissed on February 4, 1986, for want of prosecution for failure to appear at the trial call.

Mulkey and respondent dispute whether respondent promised to represent Mulkey once Rickelman left the firm. However, the evidence shows that respondent's firm filed motions bearing respondent's signature and succeeded in reinstating the case on one occasion. Moreover, respondent had conversations with defense counsel in the matter and paid $1,600 in sanctions for not complying with discovery orders in connection with Rickelman's handling of the matter. The case was eventually dismissed with prejudice for want of prosecution on April 17, 1986. An April 15, 1988, motion seeking to reinstate the case was stricken because no one appeared for Mulkey at a June 12, 1988, proceeding.

The Hearing Board found that although Rickelman was Mulkey's counsel at the beginning of the case, respondent assumed responsibility once Rickelman left the firm. The Hearing Board concluded that respondent's failure to appear on Mulkey's behalf or to have another member of his firm do so represented neglect in violation of Rule 6—101(a)(3) and failure to carry out a contract of employment in violation of Rule 7—101(a)(2) (107

Ill. 2d Rules 6—101(a)(3), 7—101(a)(2)). Moreover, the Board concluded that respondent's conduct also prejudiced or damaged Mulkey in violation of Rule 7—101(a)(3) and was also prejudicial to the administration of justice in violation of Rule 1—102(a)(5) (107 Ill. 2d Rules 7—101(a)(3), 1—102(a)(5)).

## FACTORS IN MITIGATION

The Hearing Board found the following factors in mitigation. First, respondent had not previously been subject to discipline. Moreover, seven character witnesses, including three judges and several attorneys, "consistently and uniformly attested that [respondent's] reputation for honesty and integrity was above reproach." Among the details of this character testimony was that respondent (1) could not deny assistance to anyone needing help; (2) is a vigorous advocate of his clients; (3) assists youth sports and Marian High School; and (4) often works many hours without billing clients, working on cases where clients have stopped paying him or where they cannot afford to pay him.

The Hearing Board concluded, after considering the record as a whole, and specifically noting the demeanor of the witnesses and the credibility of their testimony, that respondent's handling of each of his client's funds was not motivated by a dishonest or fraudulent purpose towards his clients. The Hearing Board found instead that the conversions and commingling of funds occurred "because [respondent] lost control over the administration of his law practice and *** permitted unprofessional, and unacceptable practices to govern his handling of funds." The Hearing Board also found:

> "[Resondent] was literally on the edge of an abyss every day, hardly able to keep up with each day's schedule, frequently late or missing altogether motion or trial calls, which in turn necessitated additional motions and hear-

ings seeking leave to reinstate cases dismissed for want of prosecution. \*\*\* In this frenzy, the proper handling of money was simply overlooked, deemphasized or just plan [*sic*] forgotten. Corners were cut, not dishonestly or fraudulently, but in order to keep pace with the demands of trying to handle too many cases without proper assistance. Funds destined for the Timpone client funds account were deposited in personal accounts and funds in personal accounts were transferred to the client funds account in order to reimburse or pay funds to clients. Few records were kept, and there was little, if any, attention paid to the keeping of proper records of time spent handling a client's matters. It was almost inevitable in this atmosphere that Timpone's client funds account balance would fall below the amounts clients had entrusted to Timpone and that funds belonging to one client or to Timpone himself would be used to reimburse another client without any records or accountings made of these transactions."

## FACTORS IN AGGRAVATION

The Hearing Board found the following factors in aggravation. First, the Board noted that Timpone refused to acknowledge that his handling of his client fund accounts was improper. The Board concluded that Timpone either fails to understand the mandatory rules of conduct or refuses to abide by them. The Hearing Board also noted Timpone's efforts to remove client's assets from the jurisdiction of the court to ensure that funds would be available to pay for the divorce proceeding.

## HEARING BOARD'S SANCTION

The Hearing Board determined in its report filed October 1, 1991, that respondent's conduct warranted suspension for one year and until further order of this court. The Board found that respondent needed to "convince the Administrator and the Court that he has remedied the deficiencies in the handling of funds and in the

administration of his practice before being readmitted to the bar."

## REVIEW BOARD

Both the Administrator and respondent filed exceptions with the Review Board. On September 11, 1992, the Review Board filed its report which adopted the Hearing Board's findings of fact, but recommended a six-month suspension.

## THIS COURT

The Administrator has filed exceptions to the Review Board's finding with this court, and argues (1) the Hearing and Review Boards erred in finding that respondent's conduct with regard to Lietza's and Olson's funds did not involve a dishonest motive; (2) the proper sanction for respondent's conduct is disbarment (although at oral argument the Administrator argued for a suspension for a significant period of time); and (3) respondent must pay restitution to certain clients. Respondent argues that the Hearing Board and Review Board were correct in their findings concerning Lietza and Olson and that his actions do not require more than a six-month suspension.

The Administrator first argues that the Hearing and Review Boards' finding that respondent's conduct with regard to Lietza's and Olson's funds is in error because it is against this court's precedent and is against the manifest weight of the evidence. Such a finding, the Administrator argues, is contrary to this court's precedent because this court has held that loose, careless and dilatory practices with client funds and poor bookkeeping practices will not be accepted as explanations for conversion of client funds. The Administrator cites *In re Grant* (1982), 89 Ill. 2d 247, 253, where this court stated that "[t]he hazards involved in commingling, coupled with the

actual conversion of funds *** render explanations such as 'poor bookkeeping,' 'failure to fully understand the duty' and 'no dishonest motive' completely unacceptable."

However, as the Review Board noted, while such facts do not excuse or negate the conversion of client funds, they are evidence that the conversions were not due to dishonest motive, but instead due to the careless practices respondent employed. In this regard, such evidence is clearly mitigating in determining the sanction to be imposed. As this court stated in *In re McLennon* (1982), 93 Ill. 2d 215:

> "Conversion of a client's funds, with or without a 'dishonest motive,' simply cannot be countenanced. (*In re Feldman* (1982), 89 Ill. 2d 7, 11; *In re Grant* (1982), 89 Ill. 2d 247.) *** Of course, whether the commingling and conversion involved the 'dishonest motive' focused on by the Review Board is highly significant, as are *all* of the circumstances surrounding the misconduct, in determining the sanction to be imposed. [Citation.]" (Emphasis added.) (*McLennon*, 93 Ill. 2d at 221.)

Thus, the Hearing Board's finding that respondent's misconduct was due to his frenetic practice, which indicated no dishonest motive to defraud his clients, is mitigating in determining the sanction to be imposed.

The Administrator also argues that the Hearing and Review Boards erred in finding that respondent's dealings with Lietza and Olson did not involve a dishonest motive towards those clients. The Administrator argues that the manner in which respondent "induced" Lietza and Olson to entrust him with their money, his handling of the funds, and his response to Lietza, Olson, and the ARDC regarding his handling of the funds "clearly and convincingly demonstrate" that respondent's actions were "deliberately planned and borne of impure motivations[,] *** borne of deception and greed[,] and consti-

tuted nothing more than a shell game." Concerning Lietza, the Administrator notes that respondent ignored two court orders involving Lietza's money; inaccurately testified as to why the balance in his client fund account fell below zero; offered to pay Lietza $8,000 after she brought ARDC charges; and failed to account for his handling of Lietza's funds. With respect to Olson, the Administrator argues respondent "induced" Olson to deposit a substantial amount of money with him which he placed in his personal accounts and implemented a scheme to place Olson's money outside the jurisdiction of the court.

This court has noted that the Hearing Board is in a superior position to resolve factual disputes. The Hearing Board's findings regarding the credibility of witnesses, the resolution of conflicting testimony, and any other fact-finding judgments are entitled to great deference. (*In re Blank* (1991), 145 Ill. 2d 534, 547.) This is due to the fact that the Hearing Board is able to observe the witnesses' demeanor and judge their credibility. (*In re Hopper* (1981), 85 Ill. 2d 318, 323.) Thus, the Hearing Board's factual determinations will generally not be disturbed unless they are against the manifest weight of the evidence. See *In re Ushijima* (1987), 119 Ill. 2d 51, 56-57.

We find no reason to disagree with the Hearing Board's finding that respondent's handling of Lietza's and Olson's client funds did not involve a dishonest or fraudulent motive towards those clients. Evidence was presented on both sides of this issue, and the Hearing Board, in a better position to judge such matters as credibility and intent, found that respondent did not act with a dishonest motive concerning his clients. Of note here, the Hearing Board placed particular emphasis on the witnesses' demeanor and credibility in reaching this conclusion. Moreover, despite the Administrator's argu-

ment, the evidence indicated, as the Hearing and Review Boards found, that respondent's practice was frenetic. Respondent worked from 4:30 a.m. until approximately 7:15 p.m., with a great deal of the day spent in court. Respondent also kept poor business records, not only of his time, but of his disbursals to his clients. Such evidence suggests that respondent's handling of Lietza's and Olson's money was the result of his hectic practice rather than of any dishonest intent towards his clients.

However, while respondent's conduct did not involve a dishonest motive towards Lietza and Olson, it did involve a dishonest scheme to hide assets from the jurisdiction of the court to fund future litigation. Moreover, respondent's handling of Olson's money involved deceit, as respondent returned money to Olson from his client trust fund account which contained none of Olson's funds.

## Sanction

In imposing discipline, our purpose is not to punish the attorney, but rather to "protect the public, to maintain the integrity of the profession and to protect the administration of justice from reproach. [Citations.]" (*In re Fox* (1988), 122 Ill. 2d 402, 410.) Our goal is to impose sanctions consistent with sanctions imposed for similar misconduct so as to ensure predictability and fairness in future disciplinary cases. (*Hopper*, 85 Ill. 2d at 324.) We note, however, that each case is unique and must be resolved with respect to its particular facts and circumstances. *Ushijima*, 119 Ill. 2d at 57.

Both the Administrator and respondent have cited numerous cases in their respective arguments for disbarment and a six-month suspension. We find the cases of *In re Lewis* (1987), 118 Ill. 2d 357, and *In re Elias* (1986), 114 Ill. 2d 321, to be the most helpful in determining the proper sanction to be imposed in this case. In

*Elias,* an attorney was suspended for three years for failing to maintain trust accounts, depositing client funds into personal and business accounts, commingling and converting client funds for business and personal use, and paying clients with checks which were at times dishonored. Elias induced clients into signing over settlement checks by writing those clients checks which he knew or should have known were drawn on accounts with insufficient funds. While none of Elias' clients suffered permanent loss, they did suffer injury in that their checks were at times dishonored.

In *Lewis,* an attorney was suspended for three years for engaging in a pattern of commingling and conversion. Lewis deposited settlement checks into one of his two trust accounts, and then withdrew money from those accounts to fund his professional corporation's operating account. The clients were eventually paid, and all but one with generous interest. In all, the respondent converted more than $100,000 of his clients' money temporarily for his own use. This court stated in *Lewis:*

> "We have repeatedly stressed the importance of an attorney trust account and the gravity of converting client funds, even if done without an invidious motive. (See *In re McLennon* (1982), 93 Ill. 2d 215; *In re Clayter* (1980), 78 Ill. 2d 276.) Commingling or converting a client's funds is a matter of tremendous concern as it puts the client's money at risk of depletion or loss to creditors of the attorney entrusted with its safekeeping. Violating that trust is disreputable not only for the attorney involved, but for the entire legal profession." (*Lewis,* 118 Ill. 2d at 362-63.)

Moreover, this court stated:

> "It is past time for Illinois attorneys to accept their responsibilities in maintaining client trust accounts for the protection of their client's financial interests and the reputation of the bar." *Lewis,* 118 Ill. 2d at 364.

In the instant case, respondent has converted over $70,000 of his clients' funds. While mitigating factors do exist, and the Hearing Board found that respondent did not harbor a dishonest motive towards his clients in handling these funds, respondent's conduct did involve deceit with respect to Olson and dishonesty in his scheme of hiding assets from the court. Respondent also engaged in this conduct despite court orders to account for and not dispose of certain funds. Moreover, respondent's misconduct was not an isolated incident, but consisted of a pattern of neglect of financial matters and of hiding assets from the court to fund future litigation. We find a three-year suspension from the practice of law appropriate in this case.

## Restitution

The Administrator argues that respondent owes restitution to Lietza, Olson, and Serpico. Respondent denies any obligation to pay restitution to Lietza and Olson, and argues that he has paid restitution to Serpico.

The Administrator argues that respondent converted $18,665.59 of Lietza's funds, but notes that he has paid $9,600 of those funds to Lietza's husband. Thus, the Administrator argues, respondent owes Lietza approximately $9,065.59. However, the Hearing Board found that Lietza knew she would owe respondent attorney fees after her case concluded. Moreover, Lietza did not accept respondent's offer of $8,000, did not ask for money after this offer, and has not filed suit to recover these funds. Under these circumstances, we do not order respondent to pay Lietza restitution.

The Administrator also argues that respondent owes Olson at least $26,252.22 in restitution which respondent admitted spending for his own business purposes. However, Olson testified at the disciplinary hearing that he

did not at that time seek the return of his money from respondent. Again, under these circumstances, we do not order respondent to pay Olson restitution.

However, these findings concerning restitution do not prevent any of the parties (including respondent) from seeking payment or return of any monies owed them. The findings are limited to the facts presented before us today.

The Administrator finally argues that as of the hearing date, respondent had made no efforts to satisfy the $2,320 judgment against him. However, respondent asserts in his brief that at the time the brief was being written, he was satisfying the judgment. The Administrator has filed a motion to strike this statement in respondent's brief, arguing that respondent had not satisfied the judgment. Respondent has also filed a motion supported with affidavit and argues that he in fact at that time was satisfying the judgment. The Administrator has not disputed this claim, and we thus find that respondent has in fact satisfied this judgment.

Accordingly, respondent is suspended from the practice of law for three years.

*Respondent suspended.*

JUSTICE McMORROW took no part in the consideration or decision of this case.