705 A.2d 1135

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Arthur Dixon WEBSTER.**

**Misc. AG No. 71, Sept. Term, 1996.**

Court of Appeals of Maryland.

Feb. 17, 1998.

Melvin Hirshman, Bar Counsel, and Kendall R. Calhoun, Asst. Bar Counsel, for Attorney Grievance Com'n of Maryland, for petitioner.

Andrew J. Graham, Baltimore, for respondent.

Argued before BELL, C.J., ELDRIDGE, RODOWSKY, CHASANOW, RAKER and WILNER, JJ., and ROBERT L. KARWACKI, Judge (retired), Specially Assigned.

RAKER, Judge.

Acting through Bar Counsel, the Attorney Grievance Commission filed a petition for disciplinary action against Arthur Dixon Webster for violations of the Rules of Professional Conduct. Pursuant to Maryland Rule 16–709(b),[1] we referred the matter to Judge Thomas C. Groton, III of the Circuit Court for Wicomico County to make findings of fact and conclusions of law. Following an evidentiary hearing, Judge Groton concluded that Webster had violated Rule 1.7(b) (Conflict of Interest: General Rule),[2] Rule 1.8(a) (Conflict of Interest: Prohibited Transactions),[3] Rule 1.15(a) (Safekeeping Property),[4] Rule 8.1(b) (Bar Admission and Disciplinary Mat-

---

1. By order dated June 5, 1996, effective January 1, 1997, this Court renumbered Maryland Rules governing attorney discipline proceedings and attorney trust accounts. Formerly under subtitle BV, attorney disciplinary proceedings are now found in Chapter 700 of Title 16, Maryland Rules 16–701 through 16–718. Formerly under subtitle BU, the rules regarding attorney trust accounts are now found in Chapter 600 of Title 16, Maryland Rules 16–601 through 16–618. Filed on February 28, 1997, Bar Counsel's Petition for Disciplinary Action charges Respondent with violations of Maryland Rules BU7 and BU9. The hearing judge referred to these rules in both their former and current numbering. In this opinion, we refer to the rules by their current numbering, 16–607 and 16–609, which were in effect at the time these proceedings were commenced.

2. RULE 1.7. CONFLICT OF INTEREST: GENERAL RULE.

   (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
   (1) the lawyer reasonably believes the representation will not be adversely affected; and
   (2) the client consents after consultation.

3. RULE 1.8. CONFLICT OF INTEREST: PROHIBITED TRANSACTIONS.

   (a) A lawyer shall not enter into a business, financial or property transaction with a client unless:
   (1) the transaction is fair and equitable to the client; and
   (2) the client is advised to seek the advice of independent counsel in the transaction and is given a reasonable opportunity to do so.

4. RULE 1.15. SAFEKEEPING PROPERTY.

ters)[5] of the Maryland Rules of Professional Conduct, and Maryland Rules 16–607(a) (Commingling of Funds)[6] and 16–609 (Prohibited Transactions).[7] We set forth those findings and conclusions as follows:

## FINDINGS OF FACT

"The Court makes the following findings of fact by clear and convincing evidence. Arthur D. Webster was admitted to the Maryland Bar on November 9, 1979. He presently practices law in a small firm, consisting of two other attorneys, one of whom is his father. His law office is located at 300 West Main Street, Salisbury, Maryland. Three attor-

---

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

5. RULE 8.1. BAR ADMISSION AND DISCIPLINARY MATTERS.

An applicant for admission or reinstatement to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:
(a) knowingly make a false statement of material fact; or
(b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this Rule does not require disclosure of information otherwise protected by Rule 1.6.

6. RULE 16–607. COMMINGLING OF FUNDS.

a. General Prohibition.
An attorney or law firm may deposit in an attorney trust account only those funds required to be deposited in that account by Rule 16–604 or permitted to be so deposited by section b. of this Rule.

7. RULE 16–609. PROHIBITED TRANSACTIONS.

An attorney or law firm may not borrow or pledge any funds required by these Rules to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose. An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer.

neys, John Nason, Esquire, Steve Hearne, Esquire both of Salisbury, and Paul Bekman, Esquire, the current President of the Maryland State Bar Association, appeared at trial to testify as to Arthur D. Webster's honesty, good character, and practice of law "with adherence to the highest degree of ethical conduct."

"In August 1989, David F. Brown consulted Respondent and requested he prepare a promissory note in the amount of $47,525.98 to secure an existing debt owed to him by Walter J. Hovatter. Mr. Hovatter and his wife executed the note, hereinafter referred to as the "David Brown Note" on August 18, 1989. Shortly thereafter, Mr. Webster and Mr. Hovatter discussed Mr. Hovatter's need for additional funds to build a facility which would better equip Mr. Hovatter to perform a large and lucrative contract with Dresser Industries, a company located in Salisbury, Maryland. Mr. Hovatter, at the time of his testimony in this matter, was being housed at the Maryland House of Correction Annex as a result of a sentence received upon pleading guilty to the contract killing of a race horse.

"Mr. Hovatter, through his testimony and demeanor on the stand, made clear that he blames Mr. Webster for many of his financial problems, ironically so, in that the majority of funds lent by Mr. Webster to Mr. Hovatter were never repaid by Mr. Hovatter. The loans made to Mr. Hovatter by Mr. Webster are as follows:

| DATE OF LOAN | AMOUNTS BORROWED | MATURITY DATE | AMT. DUE ON LOAN |
|---|---|---|---|
| 8/25/89 | $ 6,000.00 | 11/15/89 | $10,000.00 |
| 9/1/89 | $ 3,000.00 | 11/15/89 | $ 5,000.00 |
| 9/15/89 | $ 7,200.00 | 11/15/89 | $ 9,000.00 |
| 9/22/89 | $ 5,200.00 | 11/15/89 | $ 7,000.00 |
| 10/10/89 | $12,000.00 | 11/25/89 | $ 8,000.00 |
| | | 1/10/90 | $ 8,000.00 |
| TOTAL | $33,408.00 | TOTAL | $47,000.00 |

With the exception of the $7,200.00 amount lent on September 15, 1989, all the above loans were made by checks drawn by Respondent on an account titled "Arthur D. Webster Escrow Account." (Hereinafter referred to as "old

escrow account.") From 1982 until 1986, Mr. Webster used the "old escrow account" as his attorney trust account for the deposit of funds received from clients and third persons in connection with legal representations. In 1986 however, Mr. Webster formed a new law firm and contemporaneously therewith opened a new attorney trust account for the deposit of funds held in connection with his new firm's legal work. (Hereinafter referred to as "the new account.") Subsequent to the formation of the new firm, Mr. Webster did not use the "old escrow account" to deposit funds received in connection with his legal representations. "The old escrow account" was used for Mr. Webster's miscellaneous business and personal purposes. Respondent deposited his own funds in this account and it is from this "old escrow account" that loans were made to Mr. Hovatter as set forth above.

"Mr. Hovatter was presented as a talented machinist but, despite this talent found himself in financial difficulties causing him to obtain loans from David Brown in 1987 and 1988. Having failed to pay those loans in a timely manner, Mr. Brown hired Mr. Webster to prepare the previously referred to promissory note in the amount of $47,525.98. A discussion in late summer, 1989, by and between Mr. Hovatter and Mr. Webster regarding additional loans resulted in Mr. Webster initially providing Mr. Hovatter with an amount of $6,000.00 for which Mr. Hovatter offered to repay the principal amount in addition to a $4,000.00 payment for interest, all due and payable in November of 1989. Mr. Webster testified that he viewed this as a commercial loan and that the interest payment of $4,000.00 was therefore not illegal. Prior to making this loan, Mr. Webster did contact references of Mr. Hovatter's which included Dick Berstein, a business person for whom Mr. Hovatter had worked and who indicated to Mr. Webster that Hovatter was the best machinist he had ever seen. Webster additionally discussed the matter with Scott Campbell of Dresser Industries who verified that, in fact, Mr. Hovatter had been awarded substantial contracts with Dresser Industries.

"With the exception of the $7,200.00 amount lent on September 15, 1989, all the loans, as set forth above, were made by checks drawn on Respondent's "old escrow account" titled "Arthur D. Webster Escrow Account."

"Despite Mr. Hovatter's contracts with Dresser Industries, he continued to experience financial difficulties to such an extent that he approached Mr. Webster and requested that Mr. Webster deposit Mr. Hovatter's checks from Dresser in the Respondent's account and make various disbursements to or on behalf of Mr. Hovatter. Mr. Webster placed these funds in the "old escrow account" and made disbursements to Mr. Hovatter's creditors as well as Mr. Hovatter himself.

"Subsequent to that, Mr. Brown contacted Mr. Webster and requested that he attempt to collect on the "David Brown Note" from Mr. Hovatter. Mr. Webster was able to get Mr. Hovatter to make a series of small payments to Mr. Brown, but the note remained badly in default. Sometime prior to September 1, 1990, Mr. Webster purchased the "David Brown Note" at 75% of its then current value.

"The Respondent provided Mr. Hovatter with numerous legal services which were as follows:

(a) in June, 1990, Mr. Webster appeared on Mr. Hovatter's behalf in a district court collection action brought against Mr. Hovatter by a trade creditor, Salisbury Special Tool Company;

(b) on an unknown date in mid–1990, Mr. Webster attended a half-hour meeting with Roy Meyers, another creditor of Mr. Hovatter, in an unsuccessful attempt to renegotiate the terms of Mr. Hovatter's debt to him in connection with Mr. Hovatter's purchase of a farm in Pennsylvania;

(c) in the fall of 1990, Mr. Webster made a number of phone calls to Ford Motor Credit Company in connection with its ongoing disputes with Mr. Hovatter concerning that company's attempt to collect money from Hovatter and to repossess his Ford truck; and

(d) in December of 1990, Mr. Webster appeared in the Maryland District Court in connection with criminal charges against Mr. Hovatter for the battery of Jeff Wade, who owed Mr. Hovatter $600.

There is no evidence that Mr. Webster was paid in connection with his representation of Mr. Hovatter in these matters.

"Mr. Hovatter's financial problems continued, which resulted in Mr. Hovatter approaching Mr. Webster in the fall of 1990, and requested that he become a signatory on Mr. Hovatter's personal checking account and that Mr. Webster oversee Mr. Hovatter's financial affairs through use of this account. Mr. Webster took possession of the checkbook and wrote checks to Mr. Hovatter's creditors as directed by Mr. Hovatter. This arrangement was terminated within approximately one month when Mr. Webster learned from the bank that the account had been overdrawn as a result of checks written by Mr. Hovatter without the knowledge of Mr. Webster, as a series of checks had been withheld from the checkbook by Hovatter. In the spring of 1991, Mr. Webster prepared a document which purported to set forth all of the loans Respondent had made to Mr. Hovatter and the interest due to date. The only record or documentation that the Respondent maintained of these loans were the canceled checks. At least two of the loans listed, $1,700.00 on October 20, 1989, and $1,300.00 on March 9, 1990, were funds given to Mr. Hovatter in exchange for checks which Hovatter had given to the Respondent, and that the Respondent placed in his "old escrow account." The Respondent included these amounts plus interest charges on the document that he provided Mr. Hovatter, listing all of the outstanding loans. The document reflected that Mr. Hovatter owed to the Respondent $80,558.00 for direct loans from the Respondent.

"Mr. Hovatter requested Respondent to provide a full accounting of the monies that had been deposited with the Respondent. The Respondent prepared a document which showed receipt of two checks from Dresser Industries total-

ing in excess of $32,000.00 and disbursements made by the Respondent on behalf of Mr. Hovatter. Respondent did not account for all of the checks received from Mr. Hovatter and deposited to the Respondent's "old escrow account" between October, 1989 and February, 1991 or disbursements made by the Respondent on Mr. Hovatter's behalf. Had such a complete accounting been made, it seems apparent that the amounts of $1,700.00 and $1,300.00 listed as loans would have been revealed to have, in fact, been funds that at all times belonged to Mr. Hovatter that had been deposited in the Respondent's "old escrow account" and later paid out to Mr. Hovatter from that account. Mr. Hovatter disputed the amount Respondent claimed was due and refused to sign the Note prepared by Mr. Webster evidencing that debt.

"In July of 1991, Mr. Webster filed a confessed judgment action on the David Brown Note against Mr. Hovatter in the Circuit Court for Wicomico County. The Respondent had garnishments served on several businesses which owed Mr. Hovatter money, including Dresser Industries. Mr. Hovatter retained Steven Hearne, Esquire of Salisbury, Maryland who filed a Chapter 11 bankruptcy proceeding on Mr. Hovatter's behalf. Mr. Hearne on behalf of Mr. Hovatter wrote to Mr. Webster that Hovatter did not dispute the principal amounts or the dates of any of Mr. Webster's loans; however, he did take exception to the annualized rates of interest on the loans.

"Mr. Webster filed a proof of claim in Mr. Hovatter's bankruptcy case for over $100,000.00 in unpaid principal and interest. As a result of negotiations between Mr. Webster and Mr. Hearne on behalf of Mr. Hovatter, an agreement was reached. Mr. Hearne would prepare two notes, one note in the amount of $35,000.00 representing Mr. Hovatter's indebtedness on the "David Brown Note" and the other note in the amount of $60,000.00 representing Mr. Hovatter's indebtedness on the direct loans from Mr. Webster. The notes were signed in late January, 1992 by both Mr. Hovatter and his wife after their bankruptcy had been

dismissed for failure to make required payments. Mr. Hovatter later repudiated this agreement, subsequently had a dispute with Mr. Hearne and discharged him as his attorney.

"In February, 1992, Mr. Hovatter filed a complaint with the Attorney Grievance Commission concerning Mr. Webster's handling of monies that Mr. Hovatter had provided him through checks received from Dresser Industries and that Mr. Webster had deposited in his "old escrow account." Mr. Webster provided a written response to Mr. Hovatter's complaint. As a result, Robert P. Conrad, Esquire, Assistant Bar Counsel, advised Mr. Hovatter and Mr. Webster that no further action would be taken on the complaint.

"Dresser Industries, in March of 1992, was holding a substantial amount of money due to Mr. Hovatter for work performed. Such funds were being withheld based upon the earlier garnishment filed by the Respondent in the confessed judgment action. A note reflecting an indebtedness of $95,000.00 was prepared by Mr. Webster for Mr. Hovatter and his wife's signature. Despite Mr. Hovatter's release or discharge of Mr. Hearne as his attorney, Mrs. Hovatter asked Mr. Hearne to review the new $95,000.00 note. In addition to the note, a mutual release was prepared. Both the note and the release were signed by the Hovatters. Mr. Hovatter denies having signed the mutual release despite evidence to the contrary. The Hovatters made the first payment on the $95,000.00 note but did not make any further payments. As a result of the default, Mr. Webster thereafter filed a confessed judgment action on the $95,-000.00 note. As a result, the Hovatters sought the representation of Royal G. Shannonhouse, Esquire and Leonard Moodispaw, Esquire who moved to vacate the judgment by confession.

"Mr. Moodispaw filed a complaint with the Attorney Grievance Commission on behalf of the Hovatters, which complaint gives rise to this disciplinary proceeding against Mr. Webster. The Attorney Grievance Commission made requests of the Respondent to produce records for the "old

escrow account." A subpoena for production of such records was served on the Respondent in August, 1994. The Commission did receive some documents as of January 3, 1995, but not a complete record as had been requested. It was not until sometime later in 1995 that a complete record of the "old escrow account" was received by the Commission from Peninsula Bank.

## CONCLUSIONS OF LAW

"Rule 1.15(a). Mr. Webster committed a violation of Rule 1.15(a) by commingling funds of Mr. Hovatter, with personal funds of his own in a client trust account. Although the escrow account at Peninsula Bank of Mr. Webster was (old escrow account) from a former practice, it was still in use and entitled Arthur D. Webster Escrow Account, and therefore should have been treated as a clients' trust account or it should have been closed. Additionally, the Respondent failed to maintain records of this account.

"Rule 1.7(b). Mr. Webster committed a violation of Rule 1.7(b). Mr. Webster made numerous loans to Mr. Hovatter during the time that David Brown had hired Mr. Webster to collect from Hovatter monies past due on Mr. Brown's loan to Mr. Hovatter. There is no evidence that Mr. Brown was in any manner advised of Webster's relationship with Hovatter and that Brown thereafter consented.

"Rule 1.8(a). Mr. Webster violated Rule 1.8(a) in that during such time that he represented Mr. Hovatter in numerous matters, he was engaged in lending money to Mr. Hovatter without providing Mr. Hovatter advice that he should seek the advice of independent counsel in reference to these loans.

"Mr. Webster's representation of Mr. Hovatter was as follows: The Respondent entered his appearance on behalf of Mr. Hovatter in Wicomico County District Court collection actions brought by Salisbury Special Tool and Sears Roebuck & Co. The Respondent represented Mr. Hovatter at trial in the District Court of Maryland for Wicomico

County in August of 1990 in reference to the Salisbury Special Tool collection action. The Respondent met with a Roy Meyers in an effort to renegotiate a lease purchase agreement between Mr. Meyers and Mr. Hovatter. Mr. Webster made numerous calls to the Ford Motor Credit concerning Mr. Hovatter's debt to that company and its efforts to repossess his truck. Finally, Mr. Webster represented Mr. Hovatter on a criminal charge in the District Court of Maryland for Wicomico County.

"Rule 8.1(b). Mr. Webster violated 8.1(b) in that Mr. Webster did not respond to the request to produce his bank records. As Mr. Webster stated, (T. 2, p. 129, L. 4), "Was I dilatory? Yes. Did I put it off? Obviously, I don't want to be here today, it's very unpleasant. It's one of those unpleasant things sitting on your desk and you say I'll get to that tomorrow. And, you know, should I have responded more promptly? Absolutely. Did I intend to hinder them? No, I always figured at some point we would get it all out in the open and I had nothing to hide. It was just a matter of getting it done, getting it from the bank." It should be noted that Mr. Webster did eventually provide some of the requested information. A complete record of the account eventually was received from Peninsula Bank.

"Maryland Rule BU7(16–607) & BU9(16–609). Although the Peninsula Bank Trust Account titled "Arthur D. Webster Escrow Account" ("old escrow account") was in fact an old account that had been Mr. Webster's attorney trust account in a prior law practice, it remained an attorney trust account. The account remained titled in precisely the same fashion throughout its existence from the time of its inception and was repeatedly referred to by Respondent as his "escrow account." The deposit of Respondent's personal funds in this account violated Rule BU7 (now 16–607). The loan made by Respondent to Mr. Hovatter written from this account likewise violated Rule BU7. Numerous checks drawn from this account were made payable to cash, a violation of Rule BU9 (now 16–609)."

## I.

This Court has original and complete jurisdiction over attorney disciplinary proceedings, and, in this regard, we make an independent review of the record. *Attorney Griev. Comm. v. Garland,* 345 Md. 383, 392, 692 A.2d 465, 469 (1997). We accept the hearing judge's findings of fact unless they are clearly erroneous. *Attorney Griev. Comm. v. Sachse,* 345 Md. 578, 589, 693 A.2d 806, 811 (1997). This Court, however, makes the ultimate decision as to whether an attorney has engaged in professional misconduct. *Attorney Griev. Comm. v. Breschi,* 340 Md. 590, 599, 667 A.2d 659, 664 (1995).

Respondent filed forty-six exceptions to Judge Groton's findings of fact and conclusions of law. Forty-four of these exceptions are merely restatements of Respondent's argument and simply state an objection that the hearing judge did not accept Respondent's view of the facts. Respondent urges this Court to dismiss the charges against him "because the record fails to show that Respondent acted with bad intent or that Respondent's conduct prejudiced the respective interests of Mr. Hovatter or Mr. Brown." In the alternative, Respondent recommends that this Court issue a reprimand, because "Respondent did not knowingly violate the Rules and . . . the public is not now at risk from Respondent and does not need protection from Respondent."

We have often observed that the hearing judge is in the best position to assess the credibility of the witnesses, and this determination will not be disturbed unless clearly erroneous. *Attorney Griev. Comm. v. Glenn,* 341 Md. 448, 470, 671 A.2d 463, 474 (1996). Judge Groton's findings of fact were not clearly erroneous. Accordingly, the forty-four factual exceptions have no merit, and are overruled. The two remaining exceptions challenge Judge Groton's conclusions of law.

Respondent maintains that he did not violate Rule 1.15. That rule requires an attorney to hold property of clients that is "in a lawyer's possession in connection with a representation separate from the lawyer's own property." Respondent argues that he did not violate Rule 1.15 because the monies Mr.

Hovatter deposited with him were not monies "in connection with a representation," but were all part of a series of personal loan transactions. The hearing judge made no findings of fact as to whether the funds in the trust account were "in connection with a representation." We cannot tell from the record whether at the time Respondent received Mr. Hovatter's funds he received the money in connection with a representation. Accordingly, we find that Bar Counsel has not met its burden of proof, and we therefore grant Respondent's exception.

Respondent's remaining exception is based on the same argument: that he did not violate Maryland Rules 16–607 and 16–609 because the monies Mr. Hovatter deposited with him were not monies "in connection with a representation," and Rules 16–607 and 16–609 "do not extend any further than the requirements of Rule 1.15." In addition, from 1986 onward, notwithstanding the manner in which the account was titled, the "old account" was not an attorney trust account. Respondent argues that the mere fact that the account was entitled "Arthur D. Webster Escrow Account" cannot support a finding that he violated these rules.

A remarkably similar argument was advanced by an attorney in a California disciplinary case. In *Doyle v. State Bar of California,* 32 Cal.3d 12, 184 Cal.Rptr. 720, 648 P.2d 942 (1982), the Supreme Court of California sanctioned an attorney for violating California's disciplinary Rule 8–101, which, in substance, is similar to Maryland Rule 16–607. Rule 8–101 of the Rules of Professional Conduct of the State Bar of California [8] provides that client funds "shall be deposited in one or more identifiable bank accounts labeled 'Trust Account,' 'Client's Funds Account' or words of similar import . . . and no funds belonging to the member of the State Bar or firm of which he is a member shall be deposited therein or otherwise

---

8. Rule 8–101 of the Rules of Professional Conduct of the State Bar of California was superseded by Rule 4–100, Preserving Identity of Funds and Property of a Client. The two rules appear to be the same substantively.

commingled therewith. . . ." *Doyle,* 184 Cal.Rptr. at 726, 648 P.2d at 948. The attorney argued that the Rules of Professional Conduct do not prevent an attorney from using for personal purposes an account formerly used as a trust account, and still captioned as such. In rejecting the argument, the Supreme Court of California held:

> The rule absolutely bars use of the trust account for personal purposes, even if client funds are not on deposit. Because petitioner used the account while it was still denominated a trust account, even if he no longer intended to use it for trust purposes, rule 8–101 was violated. The rule leaves no room for inquiry into the depositor's intent.

*Doyle,* 184 Cal.Rptr. at 726, 648 P.2d at 948.

■ We agree with the Supreme Court of California that when an account is designated an attorney trust account, inquiry into the source of the funds within the account is irrelevant. Use of the trust account for personal purposes while still designated a trust account, even if it was no longer intended that the account be used for trust purposes, is prohibited. It makes no difference whether client funds are deposited in the account.

■ The purpose of the anti-commingling rules is to protect client funds from the claims of creditors of the attorney. *Glenn,* 341 Md. at 489, 671 A.2d at 483 ("the failure to keep client funds separate subjects the funds to the claims of creditors of the lawyer"); *In re Timpone,* 157 Ill.2d 178, 191 Ill.Dec. 55, 64, 623 N.E.2d 300, 309 (1993); *Arm v. State Bar of California,* 50 Cal.3d 763, 268 Cal.Rptr. 741, 748, 789 P.2d 922, 929 (1990); AMERICAN BAR ASSOCIATION, ANNOTATED MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.15 (1996). Using an account designated an attorney trust account, when it no longer actually serves as such, constitutes a holding out to the public that the monies contained therein are not subject to attachment and improperly suggests that the monies are beyond the reach of creditors of the attorney. In this case, when Respondent put his personal funds into an account entitled "escrow account" he improperly represented to his

creditors that those funds were being held for a third party. *See Disciplinary Counsel v. Mazer,* 76 Ohio St.3d 481, 668 N.E.2d 478, 479 (1996); *Discipline of Tidball,* 503 N.W.2d 850, 852, 854 (S.D.1993); *Matter of Velasquez,* 507 A.2d 145, 149 (D.C.1986); *Comm. on Prof'l Ethics and Conduct of Iowa State Bar Ass'n v. Gross,* 326 N.W.2d 272, 273 (Iowa 1982). An attorney may not avoid responsibility for misuse of a trust account, even if such misuse was inadvertent. *Attorney Griev. Comm'n v. Boehm,* 293 Md. 476, 481, 446 A.2d 52, 54 (1982).

In this case, Respondent placed his personal funds, other business funds, and Mr. Hovatter's funds in the attorney trust account. Based on his argument that none of this money was received in connection with a representation, none should have been placed in the account. Respondent kept no accounting of Mr. Hovatter's funds previously deposited into the account, and, in further violation of the rules, he wrote checks payable to cash from that account. These actions violated Rules 16–607 and 16–609. Respondent's exception is overruled.

Bar Counsel filed no exceptions to the hearing judge's findings of fact or conclusions of law. As the appropriate sanction, Bar Counsel recommends that this Court impose a suspension of two years.

## II.

We turn now to the issue of the appropriate sanction. We judge each case separately based on the particular facts and circumstances. *Attorney Griev. Comm'n. v. Powell,* 328 Md. 276, 300, 614 A.2d 102, 114 (1992). The purpose of a disciplinary hearing is not to punish the errant lawyer but rather to protect the public, to maintain the integrity of the legal profession and to deter other lawyers from engaging in violations of the Rules of Professional Conduct. *Attorney Griev. Com'n v. Myers,* 333 Md. 440, 447, 635 A.2d 1315, 1318 (1994).

In addition to the trust account violations, Respondent also violated the rules related to conflict of interest. These actions merit some sanction. *See Attorney Griev. Comm'n v. Sliffman,* 330 Md. 515, 522, 625 A.2d 314, 317–18 (1993) (sanctioning attorney for developing a differing interest than his client as a result of a loan transaction and failing to disclose it). Respondent also failed to respond to Bar Counsel's requests for information. *See Attorney Griev. Comm. v. Milliken,* 348 Md. 486, 704 A.2d 1225 (1998).

Respondent's violations do not appear to be a result of intentional wrongdoing, but rather the result of negligence and carelessness. In addition, we consider as a mitigating factor that none of Respondent's clients were injured as a result of his actions. *Attorney Griev. Comm'n v. Kandel,* 317 Md. 274, 282, 563 A.2d 387, 391 (1989). Indeed, Mr. Hovatter has never repaid the loan to Respondent, and Respondent is the only party who has been financially injured.

Considering all the circumstances in this case, we think the appropriate sanction is a 30–day suspension. *Cf. Attorney Griev. Comm'n v. Engerman,* 289 Md. 330, 348, 424 A.2d 362, 371 (1981) (finding 30–day suspension appropriate when attorney's misconduct included improperly acquiring an interest in litigation and failing to preserve the identity of client funds). The suspension of Arthur D. Webster from the practice of law in this State shall begin thirty days from the date of this opinion.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715(c), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST ARTHUR D. WEBSTER.*